## LIZZIE T. BARNES vs. WILLIAM H. STARR, EXECUTOR, ET AL.

Third Judicial District, New Haven, January Term, 1894. ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The plaintiff and the defendants' testator, who were engaged to be married,
  executed an ante-nuptial contract whereby the former, in considera-
  tion of receiving $5,000 from the latter, or from his estate in case she
  outlived him, relinquished all her statutory rights in his estate.  This
  agreement was made for the purpose of being shown to the friends and
  relatives of the testator who were opposed to, and endeavoring to dis-
  suade him from, such marriage, and thereby removing their opposi-
  tion; and the testator promised that as soon as it had accomplished its
  object, the contract should be destroyed.  The parties were shortly af-
  terwards married.  The husband, however, did not destroy the con-
  tract, but caused it to be carefully preserved, and meanwhile made a
  will in which he bequeathed to the plaintiff $5,000, in lieu of dower
  and of any statutory right in his estate, "according to the terms of a
  contract of marriage," etc., referring to said ante-nuptial contract.
  The plaintiff knew, about a year before her husband's death, that the
  contract was still in existence, but did nothing to assert her alleged
  rights until after his death.
Held, that the plaintiff's conduct in executing the ante-nuptial contract
  for the purpose of deceiving the heirs at law of her intended husband,
  debarred her from receiving aid from a court of equity ; and that the
  maxim that he who comes into a court of equity must come with clean
  hands, was applicable, and prevented the plaintiff from obtaining
  equitable relief.  And especially so where, as in the present case, the
  plaintiff unreasonably delayed, without any apparent cause, in expos-
  ing the alleged fraud, until after the death of the other contracting
  party; although the law imposed upon her the duty of speedy action
  after obtaining knowledge of the facts.

[Argued January 16th—decided March 6th, 1894.]

SUIT for the cancellation of an ante-nuptial contract en-
tered into between the plaintiff and the defendants' testator ;
brought to the Superior Court in Fairfield County and tried
to the court, *John M. Hall, J.;* facts found and judgment
rendered for the plaintiff and appeal by the defendants.
*Judgment reversed.*

The case is sufficiently stated in the opinion.*

* Counsel for the appellants, having received the supplementary brief of

*Samuel Tweedy* and *Lyman D. Brewster*, with whom was *J. Belden Hurlbutt*, for the appellants (defendants).

I. Will a sealed and acknowledged agreement, expressly authorized by statute, mutual in its consideration, entered into by the petitioner for the express intention of deceiving third persons contingently interested in the subject-matter of the agreement, and whose conduct and duties would necessarily be affected by the sham agreement, and which was to be destroyed after accomplishing its purpose, and which does in fact deceive the persons it was intended to deceive, be canceled by a court of equity on the request of the petitioner, after the death of the other party to the instrument, to the injury of the parties whom it was intended to deceive? Is not the *delictum* of the plaintiff increased by not exposing the deception after the making of the will and during the life of the husband, after she knew it had not been destroyed? *In re Great Berlin Steamboat Co.*, L. R., 26 Ch. Div., 616.

If it be said that this sham agreement differs from a sham deed, in fraud of creditors, to which it has been likened, in that the creditors in that case are defrauded of a present property right, we say in reply: the irrevocability applies to subsequent creditors, as well as to existing ones, and that after the will was executed the relatives had an existing property right, as they had an assignable interest before the will was made. *Trull* v. *Eastman*, 3 Met. (Mass.), 121; *Jenkins* v. *Stetson*, 9 Allen, 128; *McBee* v. *Myers*, 4 Bush (Ky.,) 356; *Fitzgerald* v. *Vestal*, 4 Sneed (Tenn.), 258; *Stewart* v. *Stewart*, 5 Conn., 321.

The plaintiff must come into court with clean hands. He must not be a party to the deception of which he complains. *Cadman* v. *Horner*, 18 Vesey, 10; *Clermont* v. *Tosbrough*, 1 J. & W., 112; *Strathmore* v. *Bowes*, 2 Cox, 28; 1 Pom. Eq.

the appellee only an hour or two before the argument was to begin, requested an extension of the usual time for argument, on that account. Counsel for the appellee made no objection.

The court, under the circumstances, granted the request, but stated that if the appellants' counsel had asked that the brief should not be received because presented so late, the court would have enforced the rule and declined to receive it.—R.

Juris., §§ 398, 401, 404; 1 Beach, Modern Eq., § 78; *Huxley*
v. *Rice,* 40 Mich., 73; *Peek* v. *Derby,* L. R., 37 Ch. Div., 541;
*Pidding* v. *Howe,* 8 Sim., 477; Story's Eq. Juris., 13th ed.,
Vol. I., § 293.    As to underhand agreements in cases of mar-
riage, see *Boynton* v. *Hubbard,* 7 Mass., 102; *Roberts* v. *Rob-
erts,* 3 Peere Williams, 74 and note; Bigelow on Fraud;
*Palmer* v. *Neave,* 11 Vesey Jr., 165; *Ainslie* v. *Medlycott,*
9 id., 24 and note; *Scott* v. *Scott,* 1 Cox Ch., 366, 378, 379;
2 Swift's Digest, 89 (side p. 79); Story's Equity, 13th ed.,
§§ 266, 270; Pomeroy on Equity, § 931, note 2; *Duval*
v. *Wellman,* 124 N. Y., 156.    The parties to this contract did
not occupy any confidential relation.    *Neely's Appeal,* 124
Penn. St., 406; *Shear's Appeal,* 121 id., 308; *Kesler's    Es-
tate,* 143 id., 386.

II. The facts found do not warrant the decree.    The court
does not find that any of the alleged false representations
were proved, except the promise to destroy.    Does a parol
promise not to perform a written promise, of itself warrant
the canceling of the written promise?    Such oral promise
is within the statute of frauds.    Reed on Stat. of Frauds,
§ 478 and cases cited.    If admissible, the fact thereby proved
did not constitute an actionable fraud.    A mere promise to
do an act in the future is not a fraud.    *Fenwick* v. *Grimes,*
5 Cranch C. C., 439; *Long* v. *Woodman,* 58 Maine, 49; *Burt*
v. *Bowles,* 69 Ind., 1; *Foutie* v. *Foutie,* 34 id., 433; *Bethell*
v. *Bethell,* 92 id., 318; *Seivking* v. *Litzer,* 31 id., 13; *Gage*
v. *Lewis,* 68 Ill., 604; *Knowlton* v. *Keenan,* 146 Mass., 86;
*Dane* v. *Morris,* 149 id., 188; *Feret* v. *Hill,* 15 C. B., 207;
*Farrar* v. *Bridges,* 3 Hump. (Tenn.), 566; *Viscountess* v.
*Maxwell,* 1 Peere Will. 618; *Maunsell* v. *White,* 4 H. L. 1055;
*Beattie* v. *Lord Ebury,* 7 Ch. App., 804; *Ex parte Fisher* v.
*Court C. P.,* 18 Wend., 608.    The cases of *Ayres* v. *French,*
41 Conn., 142, and *Dowd* v. *Tucker,* 41 id., 197, are not in con-
flict with our position and claim.    In *Ayres* v. *French* the
general rule is recognized (page 153), and that case is likened
to that of a purchaser of goods with a preconceived design
not to pay for them (and not a mutual design); and *Dowd*
v. *Tucker* is put on the same ground and also that of a trust.

III. Even if the false promise to destroy the sham agreement is actionable it is not the gist or substance of the complaint. Pomeroy on Remedies and Remedial Rights, 554–557; Bigelow on Fraud, 490, 491; *Pettigrew* v. *Chellis*, 41 N. H., 95; *Page* v. *Parker*, 40 id., 47; *Phalen* v. *Clark*, 19 Conn., 433.

IV. The decree is bad for contradiction and uncertainty. Where the findings are contradictory, those must be applied which are most favorable to the defeated party in aid of his exceptions. *Bonnell* v. *Griswold*, 89 N. Y., 122, 127; *Schwinger* v. *Raymond*, 83 id., 192.

*Goodwin Stoddard* and *Samuel Fessenden*, for the appellee (plaintiff).

I. Courts of chancery have long exercised jurisdiction to adjudge void in the hands of a defendant instruments unlawfully obtained from a plaintiff, and to order their surrender and cancellation whenever such order ought, in equity and good conscience, to be made.

It is one of the facts in this case that the signature of the plaintiff to the ante-nuptial agreement involved was obtained from the plaintiff by Mr. Barnes through his misrepresentation, deceit and deliberate and designed fraud, while he stood in the relation of betrothed husband to her. Beach on Modern Equity, Vol. 2, § 551; Pomeroy's Eq., Vol. 2, § 870; Vol. 3, § 1377; Vol. 2, § 850 and note; Story's Eq., Vol. 2, §§ 692, 694, 695, 695a.

Courts of equity exercise a vigilant scrutiny of marriage settlements and ante-nuptial agreements generally, *owing to the confidential relations of the parties*, whenever fraud has been alleged.

The following are some of the leading modern cases on this subject: *Pierce* v. *Pierce*, 71 N. Y., 154 (1877); *Kline* v. *Kline*, 57 Penn. St., 120 (1868); *Nealey's Appeal*, 124 id., 406 (1889); *Falk* v. *Turner*, 101 Mass., 494 (1869); *Russell's Appeal*, 75 Penn. St., 269 (1874); *Page* v. *Horne*, 11 Beav., 227 (1848); *Cobbett* v. *Brock*, 20 id., 524 (1855); *Taylor* v. *Rickman*, 1 N. C., 278 (1853); *Coulson* v. *Allison*,

De Gex, F. & J., 521 (1860) ; *James* v. *Holmes*, 31 L. J. (N. S.) Ch., 567 (1862) ; *Oliver* v. *Oliver*, 4 Rawle, (Penn.) 141 (1833). And see review of the adjudication on this subject, White and Tudor's Leading Cases in Equity, 4th Am. ed., p. 1156, case of *Huguenin* v. *Basely*, and note.

II. The plaintiff's complaint presented to the court this question : " Was her signature to the writing obtained by the fraudulent and deceitful promise of Mr. Barnes to destroy the paper and his fraudulent misrepresentation of his financial condition ? " This proposition was denied by the defendants, and upon the issue so joined relevant testimony to show any part or portion of the fraud set forth in the complaint is admissible. *Holly* v. *Brown*, 14 Conn., 268 ; *Sprague* v. *Taylor*, 58 id., 548. Of course we could not prove the promise to be fraudulent and deceitful without proving, (*a*) what the promise was, (*b*) that it was broken, and (*c*) with what purpose and intent it was made. Bigelow on Fraud, 146 ; *Stauffer* v. *Young*, 39 Penn. St., 455 ; *Knight* v. *Houghtalling*, 85 N. C., 17 ; Pomeroy's Eq., Vol. 2, § 859. The statute of frauds has no application to such a state of facts. *Jervis* v. *Berridge*, 23 L. R., N. S., 43 ; Browne on the Stat. of Frauds, 4th ed., § 441*a ;* Rice on Evidence, Vol. I, p. 256 ; *Kersselbrack* v. *Livingstone*, 4 Johns. Ch., 144 ; *Glass* v. *Hulbert*, 102 Mass., 41 ; *Hicks* v. *Stevens*, 121 Ill., 186 ; *Murray* v. *Mann*, 2 Exch., 558 ; Am. & Eng. Ency. of Law, Vol. 17, Art., Parol Ev., page 447, and cases cited. Parol evidence is admissible to resist the fraudulent use of a writing obtained without fraud. *Oliver* v. *Oliver*, 4 Rawle's Rep., 141, (Penn.) (1833) ; *Hirst* v. *Kirkbridge*, 1 Binn., 616 ; *Hultz* v. *Wright*, 16 Serg. & R. 345 ; *Lyon* v. *Huntington, etc.*, 14 id., 283 ; *Thompson* v. *White*, 1 Dall., 424 ; *Rearich* v. *Swinehart*, 11 Pa. St., 240 ; *Christ* v. *Diffendach*, 1 Serg. & R., 464 ; *Fishback* v. *Woodford*, 1 J. J. Marshall, 84 ; *Edrington* v. *Harper*, 3 id., 353 ; Brown on Parol Evidence, 55 ; *Hicks* v. *Stevens*, 121 Ill., 193 ; *Goodwin* v. *Horne*, 60 N. H., 486.

III. If by the rules of evidence the plaintiff's testimony was admissible, and the facts alleged are true, the only remaining question on this point of the case is whether the

court is warranted in granting the relief prayed for, namely, that the writing should be declared void and delivered up to be canceled. *Kelley* v. *McGrath*, 70 Ala., 75.

That a husband, in contemplation of marriage, may commit frauds upon the rights which on the marriage would accrue to the intended wife, from which, after marriage, a court of equity will relieve her as it relieves the husband from the ante-nuptial frauds of the wife, is recognized by a large number of adjudications in this country, and has the sanction of a direct decision by Chancellor KENT. 2 Bish. Mar. Wom., §§ 352–3; 1 Scrib. Dower, 560, 564; *Swane* v. *Parine*, 5 John. Ch., 482; 9 Am. Dec., 318; *Cranson* v. *Cranson*, 4 Mich., 230; *Petty* v. *Petty*, 4 B. Monroe, 315; 29 Am. Dec., 501; *Tate* v. *Tate*, 1 Dev. & Bat. Eq., 22; *Smith* v. *Smith*, 2 Halst. Ch., 515; *Jenney* v. *Jenney*, 24 Vt., 324; *Deermon* v. *Deermon*, 10 Ind., 59.

IV. A false, deceitful and fraudulent misrepresentation of intention and purpose whereby the plaintiff is prejudiced in her rights, is an actionable fraud.

The plaintiff claims that Barnes' state of mind, intention and purpose was, under the circumstances, a fact and a material fact on which the plaintiff had a right to rely. Cooley on Torts, p. 487; *Long* v. *Woodman*, 58 Me., 49; *Mundy* v. *Beckwith*, 48 Ill., 391; *Loupe* v. *Wood*, 51 Cal. 586; *Jarden* v. *Money*, 5 H. L. Cas., 185; Cooley on Torts, 486; *Bradley* v. *Obear*, 10 N. H., 477; *Kley* v. *Healey*, 127 N. Y., 555; *Page* v. *Bent*, 2 Met., 371; *Conlan* v. *Rolmer*, 23 Vroom, 53; *Norfolk, etc.* v. *Arnold*, 49 N. J. Eq., 395. Intention is a fact to be proved as any other fact. 11 Am. & Eng. Ency. of Law, 376.

"It may be difficult to prove the state of a man's mind at a particular time, but if it can be ascertained it is as much a fact as anything else." *Edgington* v. *Fitzmaurice*, 55 Law Journal Rep. Ch., 650; *S. C.*, 29 L. R. Ch. Div., 474; *Murdick* v. *Chenango Co. Mutual Ins. Co.*, 2 N. Y. (2 Comstock), 220–1; See 1 Story Eq. Jur., § 193, note; *Smith* v. *Richards*, 13 Pet., 26; Adams' Eq., p. 177; 2 Parsons on Contracts, p. 177; *Grimm* v. *Byrd*, 32 Gratt., 302; *Linhart* v. *Hartman,*

77 Va., 540; *Roer R. & Co.* v. *Trout*, 83 id., 397; *S. C.*, 5 Am. St. Rep., 292–3.

"False representations as to future events will vitiate a contract where those events depend upon the acts of the party making the representations and form the inducement for the contract." *Henderson* v. *San Antonio, etc. R. R. Co.*, 17 Tex., 560; *S. C.*, 67 Am. Dec., 676; 1 Beach Modern Eq., § 88; *Shackelford* v. *Handley*, 1 A. K. Marshall, 496; *S. C.*, 10 Am. Dec., 753; Bigelow on Fraud, p. 12; *Gross* v. *McKee*, 53 Miss., 538; *Ayres* v. *French*, 41 Conn., 153; *Dowd* v. *Tucker*, id., 203; *Wainwright* v. *Talcott*, 60 id., 43; *Feltz* v. *Walker*, 49 id., 93.

V. The parties stood in a confidential relation and a court of equity will not suffer the dominant party to gain an advantage over the other. 3 Leading Cases in Equity, 119; *Gilmore* v. *Burch*, 7 Or., 374; *S. C.*, 33 Am. Rep. 715; *Kline* v. *Kline*, 57 Penn. St., 120; *Kline's Estate*, 64 Pa. St., 122; *Tarbell* v. *Tarbell*, 10 Allen, 278; *Fay* v. *Rickman*, 1 N. C., (Bush's Eq.), 278; *Woodward* v. *Woodward*, 5 Sneed, 49; *Achilles* v. *Achilles*, 137 Ill., 589; *Neeley's Appeal*, 124 Penn. St., 406; *Page* v. *Horne*, 11 Beav., 227; *Wollaston* v. *Tribe*, 9 L. R. Eq., 44.

"Undue influence may easily be exercised under the intimate relation created by an engagement to marry." The Law of Fraud by Bigelow, p. 351; 2 White & Tudor's Leading Cas. in Equity, *Huguenin* v. *Baseley*, p. 633.

VI. The plaintiff was not *in pari delicto*.

"Parties are not in *in pari delicto* unless the act itself is immoral or a violation of the general laws of public policy, and when the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover." Lord MANSFIELD in *Smith* v. *Bromley*, 2 Douglass, 697.

The general rule that equity will not aid either party to a fraud, does not apply where one of the actors exercises an undue dominion over the other, by reason either of physical or intellectual weakness, or from a confidence admitting of imposition. *Boyd* v. *d'la Montagnie*, 73 N. Y., 498; *S. C.*, 29 Am. Rep., 197; *Barnes* v. *Brown*, 32 Mich., 146; *O'Connor*

v. *Ward*, 60 Miss., 1025; *Freelove* v. *Cole*, 41 Barb., 318; *Anderson* v. *Meredith*, 82 Ky., 564; *Pinckston* v. *Brown*, 3 Jones Eq., 494; *Osborne* v. *Williams*, 18 Ves., 379; *Roman* v. *Mali*, 42 Md., 513; *Harrington* v. *Grant*, 54 Vt., 236; *Poston* v. *Balch*, 69 Mo., 115; *Kleeman* v. *Peltzer*, 17 Neb., 381; *Davidson* v. *Carter*, 55 Iowa, 117.

The agreement itself is not contrary to public policy nor in fraud of the rights of third parties. · It is only an improper contemplated use by Mr. Barnes of the agreement that can be complained of, but this surely is not sufficient to support the doctrine invoked.

" A party to a contract innocent in itself is not responsible for or affected by the use which the other may make of the subject of the contract." *Tracy* v. *Talmadge*, 14 N. Y., 162.

ANDREWS, C. J. The plaintiff is the widow of Samuel H. Barnes who died at Wilton on the 23d day of April, 1891. He left a paper which was duly executed as his last will. The defendants are the executors and legatees named therein, and all the persons who would be distributees of his estate in case of intestacy. The plaintiff was married to the said Samuel H. Barnes on the fourth day of August, 1886. On the 19th day of July, prior to their marriage, they mutually executed a marriage contract in these words :—

" This agreement and written contract made this 19th day of July, A. D. 1886, by and between Lizzie T. Cartwright, of the town of Norwalk, in Fairfield County and State of Connecticut, party of the first part, and Samuel H. Barnes, of the Town of Wilton, in said county, party of the second part, witnesseth : That whereas, a marriage is intended to be had between the parties to this agreement and contract, and each has property of his or her own ; and in the event of such marriage, the survivor of them would be entitled to a statutory share of the property owned by the other at the time of his or her death, as appears by the Statutes of this State. And whereas, both parties desire that by this written contract said Lizzie T. Cartwright shall receive from the said Samuel H. Barnes, his promise to pay her the sum of five

thousand dollars, in the event of such marriage, out of his estate in case she outlives him, to be hers and her representatives forever, which sum is intended as a provision in lieu of such statutory share.

" Now, therefore, in consideration of the premises, and of the sum of one dollar, received from the said Samuel H. Barnes by the said Lizzie T. Cartwright, she hereby agrees to receive and doth receive the same from him as a provision in lieu of such statutory share of his property, in case she outlives him, and she doth relinquish and release his estate from any and all further claims and demands by her and her representatives thereupon whatever.

" And the said Samuel H. Barnes, in consideration of the premises and of the sum of one dollar received to his full satisfaction from Lizzie T. Cartwright, doth hereby promise and agree to relinquish any claim upon her estate in case he outlives her, and in case she outlives him, doth promise to pay, or that she shall be paid, by his representatives, out of his estate, to her or her representatives, the sum of five thousand dollars, as a provision for her in lieu of her statutory share of his estate, to be hers and her representatives and heirs forever.

" In witness whereof said parties have severally set their hands and seals the day and year above first written, and to the faithful performance of which they mutually bind and engage themselves, each to the other, his executor and administrator, and her executrix and administratrix.

" LIZZIE T. CARTWRIGHT, [L. S.]

" SAMUEL H. BARNES,      [L. S.]

" Signed, sealed and delivered in presence of

" CURTISS THOMPSON,

" HOWARD N. WAKEMAN.


" County of Fairfield, Town of Bridgeport, *ss.*, July 19th, 1886.

" Personally appeared Lizzie T. Cartwright and Samuel H. Barnes, signers and sealers of the foregoing instrument,

and acknowledged the same to be their free act and deed, before me, CURTISS THOMPSON, Notary Public."

The complaint in this action, after setting out the fact of the marriage of this plaintiff to the said Samuel H. Barnes, and that prior to their marriage they executed the said marriage contract, alleges that :—

" 3. The said Samuel H. Barnes, in order to induce the plaintiff to execute the said instrument, represented that he had received a letter from some anonymous writer, declaring that the plaintiff's sole object in the proposed marriage with him, the said Barnes, was to obtain his, the said Barnes', money ; that he believed it was inspired by relatives of his and persons connected with him by marriage, and who were desirous of becoming the objects of his bounty ; that he desired to convince them that there was no foundation for their anxiety or fear in this respect ; that he did not believe that such was the object of the plaintiff, or that she had any such purpose in view, and that he had given them to understand that he so believed, but that he desired her to execute the said instrument that he might show it to those who were taking so much interest in his affairs, in order to relieve himself from annoyance and vexatious interference by them ; and that as soon as she had executed it and he had shown it to these parties, and thereby accomplished the purpose which he had in view, he would destroy it, and that the plaintiff's rights should not be in any manner injuriously affected by the execution of said instrument or agreement. * * *

" 5. Subsequently, and before the execution thereof, the said Barnes renewed his request that the plaintiff should join with him in the execution of said instrument, and as a further inducement to cause the plaintiff to acquiesce and to execute the same, represented to her that it would make but little difference to her anyway, as he was worth only fifteen thousand dollars, and he again stated to the plaintiff the reason why he desired her to execute the instrument, and again declared that he would destroy it as soon as he had shown it to the parties to whom he referred.

" 6. Relying upon these statements, and the promise of the said Barnes, the plaintiff was induced to execute the said instrument, and did execute the same on the 19th day of July, A. D. 1886. * * *

" 10. The said representations made by the said Barnes to the plaintiff to induce her to execute said instrument, and relying upon which she did execute the same, were false, and were made with the fraudulent intent to defraud the plaintiff, and to induce her to execute said agreement, and without any intention to use it for any such purpose with the parties referred to by said Barnes, or to destroy it after he had shown it to them; and at the time when the said representations were made the said Barnes was worth seventy-five thousand dollars.

" 11. Said representations were made, and said instrument was procured to be executed in the manner in which it was, fraudulently and with intent to defraud, and to deprive the plaintiff of her statutory rights in the estate of said Barnes."

The complaint ended with a prayer that the said marriage contract be declared to be void, and to be delivered up to be canceled. The Superior Court passed a decree granting the prayer of the complaint. The defendants have appealed to this court. There are in the complaint, as claimed by the plaintiff, three specifications of fraud by her late husband, relying upon which she says she signed the said marriage contract, and on account of which she asks that it should be set aside: (a) That he had received an anonymous letter, the authorship of which he attributed to his relatives and persons connected with him by marriage, warning him not to marry the plaintiff, and he wanted the contract to relieve him from their interference, etc.; (b) that he promised to destroy the contract as soon as he had secured that purpose; and (c) that he represented to her that he was not worth more than fifteen thousand dollars.

The finding so far as it bears upon these claims of the plaintiff is as follows: The plaintiff, whose maiden name was Lizzie T. Cartwright, first became acquainted with Mr. Barnes about the first of January, 1885. He was then a widower—

his wife having died in the month of September 1884. He was then seventy-five years of age. It was about the middle of July that he first proposed marriage to her. She was then forty-five years old and had never been married. She did not accept the proposal at that time, hesitating on account of the disparity of their ages and for other reasons. At that time and for about ten years prior thereto, she had been living with her sister Mrs. George T. Hunter, where she was treated as one of the family. She had upwards of one thousand dollars deposited in savings banks to her credit. Mr. Barnes was a well preserved man for his years and apparently vigorous. He had always been a farmer. The plaintiff knew in a general way that he had considerable property. She knew that he owned his farm, which was a nice farm, well stocked, and that he owned the Van Zant place in Norwalk, which was worth $5,500, and believed he had sufficient income, or property from which an income was derived by him, to enable him to give up farming, rent or sell his farm, and live upon the Van Zant place in a moderate and comfortable manner, and support her and himself upon the income of his said property, without the necessity of his performing any labor himself. But she did not know nor did she inquire the amount of his property, nor in what it was invested. They became engaged to be married about the last of August or the first of September of that year. At an interview which took place between them about a month after their engagement, Mr. Barnes showed the plaintiff an anonymous letter which he said he had recently received which read:

"NORWALK, July 9, '85.

" MR. BARNES.

"Dear Sir :—I write this to warn you against taking a step you will always regret. Miss Cartwright is not the woman you should select for a wife ; she is too hateful and quarrelsome; she is the most disagreeable person to be found, she wants to rule and ride over everybody. Now I will tell you of something I overheard her say. She said when asked if she loved you, No, how could I love that old thing, but I

could love his money, and when I get him I will have things all my own way, and I will make him stand around. Yes, and so she would. I felt sorry for you to think you were going to throw yourself into such an abyss of trouble and so wrote as a friend to warn you in time to steer clear of her. She expects to marry you and when once installed in your home, you can bid farewell to happiness. Now this is the truth, you may not believe it, but will have a chance of believing it, should you marry her.

"Mr. Hunter would be happy to have some one take her off his hands, because she quarrels with all around her. Of course she will be sweet on you, as the spider was on the fly, until she gets you where she wants you. Then look out. Remember, you have been warned, now do as you please. This is in confidence. If you should speak of this it would all be denied, and smoothed over, but this is the facts I have written. FROM A FRIEND."

He said to her he thought it came from Mr. Nelson Gorham's folks. He also showed her the marriage contract and asked her to sign it. She asked what it was. He said it was a little form he wanted her to sign, so that he could show it to those people who felt so badly about his getting married, and said to her: "I don't believe you have any idea about marrying me for my money, but I would like this, so that I can show it to them, they feel so badly about my marrying you, and I want to convince them that you are not such a person, and you can have confidence in me that I will destroy it as soon as we are married." He appeared to be angry and excited about the letter, and said he did not believe the purport of the letter but thought it a scheme to set him against her, yet at the same time he would like to have her sign the marriage contract, so that he could show it to those people who were complaining or objecting about his getting married, and that if she would sign it he would destroy it as soon as he had shown it to them. The plaintiff at that time declined to sign the contract. In the autumn of that year Mr. Barnes again spoke to the plaintiff about the marriage contract, and

she again declined to sign it, telling him " that the other peo-
ple might get hold of the paper and make trouble." About
the last of June, 1886, Mr. Barnes spoke again to the plaintiff
about the marriage contract. At that time he told her " that
she need not be afraid to sign this marriage contract; that
all he wanted it for was to convince those people that she
was not the person they represented; that if she signed it, it
would stop those people bothering her; that it would make
little difference with her any way, as he was not worth more
than $15,000; that after they were married he would have
it in his power to do what was right, and that if she would
sign it he would destroy it as soon as he had showed it to
those people."

Mr. Barnes had had only one child, a daughter, who was
married to Mr. Nelson Gorham in 1855. She died in 1857,
leaving no children. Mr. Barnes lived with Mr. Gorham for
a number of years after Mrs. Gorham died, and for some time
after Mr. Gorham had married again, and was on terms of
great intimacy with him and his family. Gorham was a near
neighbor to, and at all times a trusted and confidential friend
of, Mr. Barnes. He attended to matters of business for Mr.
Barnes, collected his rents and deposited money for him.
Bradley Gorham, a son of Mr. Nelson Gorham, also attended
to business matters of a like nature for Mr. Barnes.

Mr. Barnes delivered the marriage contract to Mr. Gorham
shortly after the marriage, who informed the nephews and
most of the legatees in the will that he had it, and of the
nature of its contents. He kept possession of it until after
Mr. Barnes' death.

It is found that relying upon the representations of Mr.
Barnes, and believing that said contract was not to be of bind-
ing force upon her, or in any way affect her right in her hus-
band's estate after her marriage, but was to be destroyed and
canceled within a short time and as soon as it had served the
purpose which Mr. Barnes said its execution was intended to
accomplish; and without intending to agree to, or to be
bound by the provisions of the said marriage contract, the
plaintiff signed the same on the day it bears date; and that

the statements made by Mr. Barnes as to the amount of his property, and to his intended destruction of said marriage contract as soon as he had shown it to certain people who, as he claimed, were objecting to his marriage with the plaintiff, were false and untrue, and were made to the plaintiff for the purpose of fraudulently inducing her to sign said contract, and thereby relinquish the interest in his estate which would after marriage vest in her as his wife ; and that Mr. Barnes was worth at that time at least $75,000, and that he had no intention whatever of keeping his promise, and destroying said contract as soon as he had shown it to certain people, or at any time thereafter. And the trial judge says: "I find that the plaintiff was induced to sign said contract mainly by reason of the promise and representation that the same should be destroyed ; but I do not intend to find that she was wholly uninfluenced by the other false representations made to her by her husband previous to the execution of said contract, and hereinbefore detailed."

Mr. Barnes made his will on the 16th day of June, 1890. The plaintiff knew at the time that he was making his will, but did not know anything of its provisions until after his death. The plaintiff learned, some time before the will was made, that the marriage contract had not been destroyed.

Whenever fraudulent representation is the ground upon which relief is sought in a court, certain essential ingredients must be proved :—That the representation was made as a statement of fact ; that it was untrue and known to be untrue by the party making it ; that it was made for the purpose of inducing the other party to act upon it ; and that the party to whom the representation was made was in fact induced thereby to act to his injury. Unless these ingredients are shown the case is not sustained.

An examination of the foregoing finding discloses that the representation mentioned in the first specification of fraud set forth in the complaint, is not found to be untrue, but rather the contrary. As to the representation which is the subject of the third specification, it is not found that the plaintiff was induced thereby to execute the marriage con

tract.  The trial court, after finding specifically that the
promise by Mr. Barnes to destroy the marriage contract did
induce the plaintiff to sign the same, says as to the other
false representations, (of which the one contained in the
third specification is the only one found to be untrue) :—
" But I do not intend to find that she was wholly uninfluenced
by the other false representations made to her."  The whole
significance of this language is expended in declaring the
state of mind in which the judge then found himself.  It is
not a finding that the plaintiff was not influenced by the
other false representations ; and still less is it a finding that
she was in fact induced by such other representations to sign
that contract.  At the most it is the declaration of an ina-
bility to find either way.  The only fraudulent representa-
tion then, upon which the judgment in this case can be
founded, is the promise by Mr. Barnes to destroy the mar-
riage contract.

The circumstances which led up to the making of the con-
tract involved in this case, as they appear in the complaint
and in the finding, and upon which the plaintiff claims that
it should be canceled, are these :—In the summer of 1885 the
plaintiff, a maiden lady of high respectability, aged forty-five
years, of limited pecuniary means, living in the family of her
married sister as a member of the family, received a proposal
of marriage from a man thirty years her senior but well pre-
served, against whose character and standing nothing is sug-
gested, and whom she understood to be possessed of consider-
able fortune.  It was an eligible offer, creditable to her, and
one which in a prudential point of view, it would seem, was
an exceedingly desirable one to accept.  It is stated on the
very highest authority that marriage is honorable in all.  Pre-
ferment in marriage may always be sought by an honorable
woman with the approval of the law, and with the approba-
tion of society.  The plaintiff and Mr. Barnes had both
reached that time in their lives when the *ardor amantium*
does not hold sway, and when considerations drawn from
sober practical experience are altogether more likely to in-
fluence the conduct.  At five and forty a woman can calcu

late.   Unless the plaintiff was different from most of her sex
she desired this marriage.   That she regarded the offer as a
favorable one is shown by her subsequent action.   After a
suitable period of delay, sufficient for such reflection and in-
quiry as she deemed necessary, she accepted the offer and she
and Mr. Barnes became engaged to be married.   No time
was, however, set for the celebration of the ceremony.   Short-
ly after their engagement Mr. Barnes received a letter which
is set out in the finding.   Its tone of candor towards, and
friendship for, him, and its severe criticisms upon the plain-
tiff, were well calculated to make estrangement between them.
Its authorship gave it much force.   Mr. Barnes attributed it
to that family to which he was most closely allied of any in
the world by associations and ties of affection.   They were
his most trusted and confidential friends, friends of long stand-
ing who would naturally have great influence with him.   Mr.
Barnes also believed that others of his relatives and persons
connected to him by marriage were privy to the letter.   Such
objections to her as the letter contained, coming from such a
source, could not be disregarded.   If the plaintiff desired to
marry Mr. Barnes, or if Mr. Barnes desired to marry her, such
objections from these people must be met and overcome, other-
wise the marriage would be put in peril.   If the near friends
of Mr. Barnes held such an opinion of the plaintiff as that
letter indicated, she would be very unwilling to marry him.
If she was really such a person as that letter described her
to be, it was quite certain he would never willingly marry her.
The use of the marriage contract was adapted to that condi-
tion of things in which they were situated.   If Mr. Barnes
could have that contract duly executed, to show to those
persons from whom the letter came, their oppposition would
be removed.   But to have this effect the contract must be a
valid one.   To secure that effect the plaintiff signed that con-
tract.   It apparently was used as she expected, and such use
accomplished the purpose for which it was intended.   Those
persons to whom the contract was shown were apparently
convinced that they had misjudged the plaintiff.   All their
opposition ceased; there was no more interference with Mr

Barnes *v.* Starr et al.

Barnes, nor was there any more "bothering" the plaintiff; the marriage took place and the contract was found later, in the possession of the very parties to remove whose opposition it was executed and delivered.

According to the version of the matter given by the plaintiff and found by the court, the marriage contract was to be a valid one for a time—until Mr. Barnes had shown it to those parties who were objecting to the marriage. It was to be used with them as a valid one, and then it was to be "destroyed and canceled." There would be little occasion to "destroy or cancel" an invalid contract. It was this marriage contract, so executed and so used, that the plaintiff prayed the court to cancel. We think she ought not to succeed and that the Superior Court erred in granting the prayer of her complaint.

These circumstances, viewed in that aspect to which the plaintiff herself asks attention, show that, in order to remove the opposition which was being made to her marriage with Mr. Barnes, she took part with him in misleading his relatives. These relatives were the heirs apparent to Mr. Barnes —persons who had rights in his estate, of which equity takes note and permits to be conveyed. 2 Spence, Equity, 865; 2 Story's Equity, 1040*e*; *Fitzgerald* v. *Vestal*, 4 Sneed (Tenn.), 258; *Jenkins* v. *Stetson*, 9 Allen, 128. They were the same persons who are the defendants in this action. They were interested in preventing the marriage. They were taking measures to prevent it. They might have succeeded. To stop their opposition, and to keep it from being successful by removing it entirely, and to gain the corresponding advantage to herself, she participated in practicing a deceit on them. She now asks the court to add another element to her deceit, and make it a fraud by canceling the contract which she signed to deceive Mr. Barnes' relatives, the present defendants, and to take away from them the consideration upon which they ceased their opposition to her marriage. This is conduct which debars her from obtaining aid in a court of equity. The very foundation principle of equity is good conscience. One of its primary maxims is

that he " who comes into a court of equity must come with clean hands "—a maxim which has been interpreted by long use to mean that whenever a party who, as *actor*, seeks to set the judicial machinery in motion to obtain some relief, has himself violated conscience or good faith in his prior conduct connected with the matter of the controversy, then the door of the court will be shut against him ; the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy. 1 Pomeroy's Equity, §§ 398 and 404. In Maddock's Chancery, Vol. 1, p. 404–5, this rule is stated somewhat more fully :—" A party calling for the aid of a court of equity must come, as it is said, with clean hands ; it being a maxim of equity that he that hath committed iniquity shall not have equity." *Cadman* v. *Horner*, 18 Vesey, 11. This statement is followed by numerous citations of cases in which contracts have been sought to be set aside, or to be enforced, and in which, by the application of this maxim, aid has been refused to the plaintiff ; as, when it is shown that there was chargeable to the plaintiff an omission or mistake in the agreement; *Joynes* v. *Statham*, 3 Atkyns' Rep., 388 ; *Woollam* v. *Hearn*, 7 Vesey, 211 ; *Mason* v. *Armitage*, 13 id., 25 ; *Myers* v. *Watson*, 1 Simons, New. Ch. Rep., 523 ; *Costigan* v. *Hastler*, 2 Schoales & Lefrey, 156 ; *Howel* v. *George*, 1 Maddock Rep. 1 ; that it was unconscientious ; *Vaughan* v. *Thomas*, 1 Brown's Ch., 556 ; or unreasonable ; *Flood* v. *Finlay*, 2 Ball & Beatty, 9 ; or that there has been fraud or surprise ; *Clowes* v. *Higginson*, 1 Vesey & Beames, 526, 527 ; *Townshend* v. *Stangroom*, 6 Vesey, 328 ; *Twining* v. *Morrice*, 2 Brown's Ch., 326 ; or that there had been concealment; *Shirley* v. *Stratton*, 1 Brown's Ch., 440 ; *Bowles* v. *Round*, 5 Vesey, 508 ; or that there had been misrepresentations, whether willful or not, latent or patent; *Scott* v. *Merry*, 1 Vesey Senior, 2 ; or any unfairness ; *Wall* v. *Stubb*, 1 Maddock Rep., 54.

The rule just quoted, that he who comes into equity must come with clean hands, is a broad one. It includes within its operation several other maxims frequently acted upon in courts of equity ; as, *ex turpi causa non actio oritur ; ex dolo*

*malo non oritur actio ; jus ex injuria non oritur ; in pari delicto potior est conditio defendentis.* The fundamental reason upon which each of these maxims seems to rest is, that a party does not come into court with clean hands, to whose cause either of these maxims may be justly applied. See also 1 Beach, Modern Equity, § 16 ; Pomeroy's Equity, §§ 397 to 404 inclusive ; 1 Story's Equity Jur. (12th ed.), § 64*e*, note ; Snell's Equity, 35 ; Smith's Manual of Equity, 23 ; *Overton* v. *Banister*, 3 Hare, 504 ; *Savage* v. *Foster*, 9 Modern, 35 ; *Nelson* v. *Stocker*, 4 De Gex & Jones, 458, 464 ; *Johns* v. *Norris*, 22 N. J. Eq., 102 ; *Walker* v. *Hill's Executors*, 22 id., 513 ; *Wilson* v. *Bird*, 28 id., 352 ; *Atwood* v. *Fisk*, 101 Mass., 363 ; *Creath's Admr.* v. *Sims*, 5 Howard, U. S., 192 ; *Bischoffsheim* v. *Brown*, 34 Fed. Rep., 156.

A very numerous class of cases coming within the same equitable doctrine is, where the contract or other act is substantially a fraud upon the rights, interests, or intentions of third parties. In a case of this kind, relief is refused to a plaintiff on the ground that he does not come into court with clean hands. The general rule is that the parties to a contract must act not only *bonâ fide* between themselves, but that they shall not act *malâ fide* in respect to other persons who stand in such a relation to either as to be affected by the contract or its consequences. Pomeroy's Equity, § 881 ; Lord HARDWICK in *Chesterfield* v. *Janssen*, 2 Vesey Senior, 156, 157 ; *Egerton* v. *Earl Brownlow*, 4 H. L. Cases, 160 ; *Ferris* v. *Hendrickson*, 1 Edward's Ch. (N. Y.), 132 ; *Paddock* v. *Fletcher*, 42 Vt., 389 ; *Huxley* v. *Rice*, 40 Mich., 73 ; *Denison* v. *Gibson*, 24 id., 187 ; *Bolt* v. *Rogers*, 3 Paige (N. Y.), 154 ; *Dunaway* v. *Robertson*, 95 Ill., 419 ; *Miller* v. *Marckle*, 21 id., 152 ; *Everett* v. *Raby*, 104 N. C., 479 ; *Parlett & Co.* v. *Guggenheimer & Co.*, 67 Md., 542, 551 ; *Medford* v. *Levy*, 31 W. Va., 649 ; *Bleaksley's Appeal*, 66 Pa. St. 187 ; *Scranton Electric H. & L. Co.'s Appeal*, 122 id., 175 ; *Lewis & Nelson's Appeal*, 67 id., 166.

There is another feature of the case which invites brief attention. It has been pointed out that the only false representation on which the judgment in this case can be founded,

is the promise by Mr. Barnes to destroy the marriage contract as soon as he had shown it to those persons from whom he believed the letter had come. In the same connection it was noted that a representation to be a fraudulent one, cognizable as such in equity, or actionable at law, must be made as a statement of fact, and that it must be untrue at the time it is made. Counsel for the defendants claim that the promise by Mr. Barnes to destroy the contract at a future time is not and cannot be a fraudulent representation. A promise to do an act in the future cannot be untrue at the time it is made, and therefore, as is claimed, cannot be a fraudulent representation. We suppose the doctrine of this claim to be well settled by the authorities. In *Beattie* v. *Lord Ebury*, L. R., 7 Ch. App., 777, 804, it is said :—" There is a clear difference between a misrepresentation in point of fact—a representation that something exists at that moment which does not exist, and a representation that something will be done in the future. Of course, a representation that something will be done in the future cannot either be true or false at the moment it is made, and although you may call it a representation, if it is anything, it is a contract or a promise." A representation of this kind if so made as to be enforceable, is so because it is a contract. " There is no middle term, no *tertium quid* between a representation so made as to be effective for such a purpose, and being effective for it, and a contract; they are identical." *Maunsell* v. *White*, 4 H. L. Cases, 1056 ; *Jorden* v. *Money*, 5 id., 185, 213, 214 ; *Citizens' Bank of Louisiana* v. *The First National Bank of New Orleans*, L. R., 6 H. L., 367 ; *Knowlton* v. *Keenan*, 146 Mass., 86 ; *Dawe* v. *Morris*, 149 id., 188–192 ; *Hartsville University* v. *Hamilton*, 34 Ind., 506 ; *Grove* v. *Hodges*, 55 Pa. St., 504 ; *Long* v. *Woodman*, 58 Me., 49. Counsel for the defendants insist that this is all there is of the plaintiff's case and that she cannot recover.

Counsel for the plaintiff deny that this is the whole of her case. They admit the rule established by the authorities cited, but they claim that her case is not in conflict with it. They insist that the promise to destroy is not their case, cer

tainly not the whole of it, not the essential part of it. They say that the promise to destroy the marriage contract at a future time was coupled with the present intention not to keep the promise ; and that the declaration of a present intention—although the act in respect to which the intention is declared is future—is the statement of a fact (*i. e.*, the intention) existing at the time ; and that if no such intention existed, it was a fraudulent representation. Cooley on Torts, 487 ; *Dowd* v. *Tucker*, 41 Conn., 197 ; *Dow* v. *Sanborn*, 3 Allen, 182. The Superior Court seems to have adopted the contention of the plaintiff on this point. .

In any case where a fraudulent representation has induced a party to enter into a contract, the contract is not wholly void. It is voidable only, at the election of the party misled. If nothing is done to avoid such a contract then it stands as a valid one. Obviously the person misled could waive the fraud and elect to treat the contract as a binding one. And what such a person could do directly, he might do indirectly. A party who, having entered into a contract, afterwards learns that a fraud has been practiced upon him by reason of which the contract may be avoided, and who neglects to take seasonable measures to set it aside, will be held to have waived the fraud and elected to treat the contract as valid. Especially is this rule applied when, during the delay, the rights of other persons have been changed. The marriage contract was executed on the 19th day of July, 1886. The plaintiff was married to Mr. Barnes on the 4th day of August following. Mr. Barnes made his will on the 16th day of June, 1890. He died on the 23d day of April, 1891. The plaintiff testified that she knew " sometime before the will was made," that the marriage contract was still in existence —not destroyed. Whether the expression " sometime " means one month, or two months, or more, or less, perhaps makes no great difference. Whenever it was, at that time the plaintiff's cause of action was complete, as fully as when this suit was brought. The fraud of which she now complains was then complete, her knowledge of it was then complete. The secret agreement between herself and Mr. Barnes, the non-

performance of which constituted that fraud, could be testified to by no person other than Mr. Barnes and herself. Mr. Barnes was then eighty years old. Whether she speculated on the advantage of having a hostile witness removed is open only to conjecture. From that time until after the death of Mr. Barnes she did nothing to assert her rights as she now claims them. Nothing has been suggested as a reason why she so remained quiescent, or why she did not take measures then to have the fraud upon her exposed. During her delay Mr. Barnes made his will. She knew that he made it, although she did not know its contents. Mr. Barnes died and the rights of the defendants in his estate have become fixed. She has been under no disability or constraint; on the contrary she has acted, so far as appears, from her own choice. She did nothing because she chose to do nothing.

In suits to rescind contracts for fraud, it is the duty of a plaintiff to put forward his complaint at the earliest possible period. *Jennings* v. *Broughton*, 5 De Gex, Marnagthen & Gordon, 126. " Acquiescence in the wrongful conduct of another, by which one's rights are invaded, may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled. * * * The same rule applies, and for the same reasons, to a party seeking purely equitable relief against fraud, such as the surrender or cancellation of securities, the annulling of a transaction, and the ·like. Upon obtaining knowledge of the facts, he should commence the proceedings for relief as soon as is reasonably possible. Acquiescence consisting of unnecessary delay after such knowledge, will defeat the equitable relief." Pomeroy's Equity, § 817 ; *Price's Appeal*, 54 Pa. St., 472; *Bolton* v. *Dickens*, 4 Lea, (Tenn.,) 569; *German Am. Seminary* v. *Keifer*, 43 Mich., 105.

This part of the case has been noticed, not because the case depends upon it, but because it illustrates and enforces the other parts of the case which have been previously considered. The conduct of the plaintiff touching the subject of her complaint in this action is pretty fully delineated throughout the

case. It shows that she has not acted with that sincerity, conscientiousness, candor and regard for fair dealing, which entitles her to the aid of a court of equity. She does not come into court with clean hands.

There is error, and the judgment appealed from is reversed.

In this opinion the other judges concurred.