PERCIVAL W. COPELAND, Respondent, *v.* FRANCIS M. HUGO, Appellant, Impleaded with INTERSTATE MORTGAGE CORPORATION, Defendant.

*Fraud and deceit — action to set aside certain agreements and to compel appellant to return securities — evidence shows that plaintiff was induced by fraud to purchase stock, sign notes and surrender valuable securities to appellant — acts of appellant's agent bind appellant — partial restitution did not amount to accord and satisfaction — commencement of action in conversion does not bar this action — false representations, though of promissory nature, were actionable — plaintiff did not deceive board of directors of appellant's corporation — damages shown.*

Appeal from a judgment of the Supreme Court in favor of the plaintiff, entered in the Oneida county clerk's office on September 30, 1926, upon the decision of the court rendered after a trial at the Oneida Special Term, and also from an order entered on the same day granting the plaintiff an extra allowance.

Judgment affirmed, with costs, upon the opinion of Mr. Justice George A. Larkin, delivered at the Special Term. Order granting an additional allowance of costs reversed, without costs on this appeal to either party. All concur. Present — Hubbs, P. J., Clark, Crouch, Taylor and Sawyer, JJ.

The following is the opinion of the court below:

LARKIN, GEORGE A., J. In this action the plaintiff seeks to set aside, because of fraud, certain agreements made with the defendant Hugo, in which the Interstate Mortgage Corporation was interested, and to compel the defendant Hugo to return securities deposited with him in connection with the contracts.

To appreciate properly the evidence it is necessary to understand the position of Hugo and the mental makeup of Copeland at the time it is asserted by the plaintiff that the fraud was practiced upon him.

Prior to June, 1922, the defendant Hugo had been for many years a factor in New York State Republican politics. He was a lawyer of many years standing. He had occupied the office of Secretary of State. In 1920 serious consideration had been given by the Republican party to his aspiration to become its candidate for Governor. After leaving the office of Secretary of State he became associated with an established business in New York city. With the background of this political prominence and his then connection with a powerful business enterprise, he became interested in the year 1921 in the development of the Interstate Mortgage Corporation, incorporated under the laws of Delaware. There had been issued to him, for little or no consideration, 50,000 shares, or one-half of the capital stock of this company. His associates were George F. Allison, a lawyer of experience, and several salesmen skilled in the sale of doubtful securities. Among them was one M. H. Manning.

During the defendant Hugo's tenure of office as Secretary of State his duties had brought him in contact with a large number of people, of whom Copeland was one. Hugo apparently capitalized this seeming acquaintance in order to facilitate the sale of his stock in the Interstate Mortgage Corporation. The testimony in this case, supported by the defendant's letters, clearly indicates that in June, 1922, Hugo was lending his prestige to the embryonic Interstate Mortgage Corporation, and that Manning, his salesman, was stressing the possibility of Hugo's gubernatorial nomination in the fall of 1922, by the Republican party.

The plaintiff Copeland is a man well advanced in middle life. He has enjoyed a considerable financial success, achieved, undoubtedly, by hard work, tenacity and thrift. He has more credulity and faith in human nature than is usually found in persons who occupy a similar place in business.

A recital of those facts in this case, which are either undisputed or established by unrefuted oral testimony of the plaintiff, corroborated to a considerable extent by written communications, leads inevitably to a determination of the main issues involved. In the latter part of June, 1922, Manning, bearing a letter of introduction from Hugo, interviewed the plaintiff at his place of business at Clark Mills, N. Y. The introductory letter was couched in language evidently intended to convey the impression to plaintiff that Hugo looked upon him as a very close friend. The occasion of Manning's visit was to interest Copeland in the Interstate Mortgage Corporation, through the purchase by the plaintiff of some of the stock which had been given to Hugo. Obviously moved by the letter of introduction, the plaintiff, without investigation, but in order to show his friendship to Hugo, took what he termed a nominal amount of stock, $2,500. Manning immediately reported to the defendant the result of his interview, expressing the opinion that Copeland could be induced to take at least 10,000 shares. Within a day or two Manning telephoned to the plaintiff that he desired a further interview to communicate a very special proposition which the defendant Hugo wished made. Confirmatory of this conversation Hugo wrote to the plaintiff a letter, in which he called attention to the expected interview and, without detailing it, referred to the special proposition to be submitted by his agent. Apparently, in order to assist Manning in every way, the defendant wrote another letter to the plaintiff, in which he emphasized the importance of the proposition to be submitted, and stated unequivocally that Manning was clothed with full authority and was his accredited representative. This letter was delivered by Manning to the plaintiff at the time of the second interview. At this meeting Manning told the plaintiff that the Republican party was planning to nominate Hugo for Governor in the fall of 1922; that Hugo's political activities would necessitate placing the control of the affairs of the Interstate Mortgage Corporation in the hands of a few trusted friends, of whom Copeland was to be one; that in order to accomplish this result it would be necessary for these few friends ostensibly, to purchase stock in the Interstate Mortgage Corporation and give notes therefor, but upon the distinct understanding that such contracts and notes were not to have any binding force and were to be surrendered at the end of a year. In addition, plaintiff was promised by Manning for this accommodation a magnificent bonus in the form of one-half of such amount of stock as he might elect to take. Copeland was impressed with the truth of this special proposition and believed that Hugo thought so highly of him that he had selected him to be his represen-

tative while the defendant attended to the duties of office of Governor of the State of New York. The suggestion of this close association with one so prominent was flattering to the plaintiff. His cupidity and avarice were aroused by the prospect of a quick, large profit. The contract of purchase was cunningly worded so as to convey to the mind of the credulous the impression that the stock, although selling for ten dollars a share, would at the end of the year be worth at least twenty-five dollars per share. With an absolute confidence in Hugo, the plaintiff acted upon this false and fraudulent representation. He entered into a contract to purchase 10,000 shares of stock and gave his negotiable notes, apparently in payment therefor. The plaintiff was well able to respond to any judgment on account of this contract or these notes. A day or two after this transaction was closed the defendant Hugo wrote to the plaintiff a letter of appreciation, which was phrased in such ambiguous language as to give credence to these false statements.

Within a day or two Manning again interviewed the plaintiff. This time he represented to Copeland that it was necessary to deposit some securities with Hugo in order to convince the board of directors of the Interstate Mortgage Corporation that the plaintiff was actually interested to the apparent extent of his said holdings, and thus enable Hugo to retain control of the corporation. As a matter of fact there was no necessity for such a course, because the corporation was controlled by Hugo and his associates Allison and Shuchous. They constituted the board of directors. This representation was a falsehood and was made for the express purpose of obtaining possession of stocks and bonds readily salable. This interview occurred on July 6, 1922. Apparently, on the day before Hugo, or some one representing him, talked with the plaintiff by telephone from New York city in reference to the proposed " visit " of Manning. This is borne out by the plaintiff's letter to the defendant dated July fifth.

Although defendant's letter of July eighth acknowledged plaintiff's letter of July fifth, it did not contradict this conversation.

After Manning had convinced Copeland of the necessity of pledging, apparently, some securities in order to promote Hugo's interests, Copeland gave to Manning approximately $20,000 worth of Stock Exchange securities, taking back Hugo's receipt signed by Manning. On the back of this receipt the plaintiff wrote that they were deposited as collateral. I am convinced that this notation was made at the time, because if a mere afterthought this wording would not have contained some statements which might be construed against the plaintiff's contention. As soon as these securities had been obtained Manning then represented to the plaintiff that Hugo was still short of control of the corporation, and that in order to avoid any question defendant wished plaintiff to give additional notes to the amount of $150,000. This the plaintiff did that evening, signing a contract for the purchase of 15,000 more shares of stock. Immediately he was importuned by Manning to deposit additional securities. He finally agreed with Manning so to do. Manning then left, taking with him the additional notes and the securities amounting to approximately $20,000. The following day the plaintiff sent valuable bonds having a face value of $35,000 directly to the defendant Hugo. As soon as these securities were received by the defendant Hugo, those given to Manning and those sent direct to him by the plaintiff, he wrote a letter under date of July eighth to the plaintiff, expressing his appreciation of plaintiff's

co-operation and confidence, but stating that the securities were being sold at the market.    Upon receipt of this letter Copeland immediately wrote to the defendant a letter protesting against the sale of his stocks and bonds, forbidding their sale, and stating that there was some apparent misunderstanding.    In this letter the plaintiff said that Manning evidently had not given him a full explanation of what Hugo was planning to do.    This letter was received by the defendant on July eleventh.

On July twelfth a letter was written by the defendant to the plaintiff and sent, not by the usual course of mail, but by a special messenger, to Clarks Mills, N. Y. Accompanying it was a letter of introduction of the messenger, in which plaintiff was requested either to sign his name with the word " Accepted " on the carbon copy of principal letter, or to wire such acceptance to Hugo.    On the same day Manning talked with the plaintiff by telephone, assuring him that the receipt asked was a mere formality, and that Hugo, although he had violated, as Manning said, instructions to him not to sell the securities, had agreed to carry out the arrangement with Copeland.    He told Copeland to sign the letter as requested by Hugo, and that he would bring to him a letter from Hugo confirmatory of all the representations which had been made.    When the messenger arrived the next morning the plaintiff, apparently lulled into a sense of security by Manning's telephone conversation, signed the carbon copy, receiving the original with canceled notes to the amount of $50,000.    This letter, instead of being a plain statement by the defendant of his position in reference to the transaction, was again phrased in such doubtful language as to give credence to all of Manning's representations, especially in the mind of one so credulous as the plaintiff.

The defendant's conduct after the receipt of the letter of protest from the plaintiff, especially the manner in which the letter of July twelfth was sent by him, coupled with its ambiguous language, is most cogent evidence against him. If he was not a party to the fraud, he, at that time, had sufficient information to apprise him of the fact that the plaintiff had entered into the transaction upon some other and different basis than a *bona fide* sale of stock.    When the occurrence of July twelfth is read in connection with the defendant's previous letters I find sufficient corroboration of the oral testimony of the plaintiff as to false statements alleged to have been made to him by Manning and plaintiff's reliance thereon. This conclusion is reached without regard to the subsequent conduct of Hugo after the repudiation of the entire transaction by the plaintiff.

When the first of the notes matured in September, 1922, Allison, as the representative of Hugo, interviewed the plaintiff in reference to renewals of them.    The plaintiff's suspicions apparently had been fully aroused by this time and he refused to have anything further to do with the transaction.    Then, for the first time, he took legal counsel.    In the latter part of September Hugo was interviewed by an attorney representing the plaintiff.    As the result of several interviews between the plaintiff, accompanied by this attorney, and the defendant, accompanied by Allison, the defendant Hugo agreed to and did surrender to the plaintiff unused notes aggregating $150,000.    In addition he paid notes aggregating approximately $50,000, which he had discounted in the latter part of August at the plaintiff's banking connection in Utica, N. Y.    The circumstances attendant upon this partial restitution tend to confirm the impression that Hugo, at the time, was cognizant a fraud had been committed.    Instead of paying the discounted notes by check, or reducing the settlement, if it was intended to be one,

to a written agreement, the defendant paid this large sum of money in amounts of approximately $10,000 each, in cash, to the plaintiff's attorney.

In January, 1923, the last of the discounted notes was paid. Immediately demand was made upon the plaintiff for the return of the securities sold. It is Hugo's contention in this action that the surrender of $150,000 of unused notes and the payment of approximately $50,000 to take up the discounted notes, was intended by the parties to be a complete accord and satisfaction. If it were so intended, the defendant's letter to the plaintiff's attorneys in response to the one demanding the return of the securities, does not so indicate. On the contrary, the defendant himself suggests further discussion of the matter. This position is hardly consonant with an accord and satisfaction.

From the foregoing recital of facts, which I deem established in this case, I am led irresistibly to the conclusion that a fraud was practiced upon the plaintiff by Manning; that thereby the plaintiff was induced to give the notes, sign the contracts and part with his securities; and that the surrender by the defendant to the plaintiff of the unused notes amounting to $150,000, and the payment of the discounted notes of approximately $50,000, was not intended to be an accord and satisfaction, but only a partial restitution. In determining the issue of fraud it is immaterial, to my mind, whether Hugo was an active participant in the fraud or not. He clothed his agent, Manning, with ample authority to represent him. His letters and conduct apparently confirmed and ratified what Manning had done. Therefore, he is responsible for the deception practiced upon the plaintiff by Manning.

The defendant contends that, even though a finding is warranted that the representations, alleged by the plaintiff, were made, they were so preposterous that no finding of reliance upon them is justified. While there may be force to this suggestion, yet, when the position of the two principals and the mental characteristics of the plaintiff are considered, it is easy to see that the confiding, credulous Copeland, his cupidity and avarice aroused by the thought of large profits, fell an easy victim to the cunning of Manning, and fully believed and relied upon his false and fraudulent statements. It is apparent that the first importunities of Manning met with little success. He was able to sell Copeland $2,500 only of the stock. All legitimate means had been exhausted by him to induce the plaintiff to enter into the scheme. It became necessary to resort to fraud and chicanery. This Manning did.

I am satisfied Copeland relied upon Manning's fraudulent statements, and that they were the inducing cause which led him to enter into this transaction. To arrive at any other conclusion would be to give judicial sanction to deceptive business methods, which, to say the least, pass the pale of fair dealing. Furthermore, it must be borne in mind that it is the gullible and credulous who rely and act upon representations which, to most people, would be preposterous and incredible. Those who have profited by a fraud which may seem to the average reasonable person incredible, should not be permitted to escape liability upon the plea of the incredibility of their own deception. Copeland refused to be duped without deceit. Thereafter it was practiced upon him. He entered into the transaction as the result of that deception. It is too late now for the defendant to be freed from liability for this fraud upon the ground that the falsehoods told by Manning were too ridiculous to be believed.

Having reached these conclusions upon the main issues, it becomes necessary to consider the other defenses urged. Defendants insist that because the complaint in this action originally sounded in conversion and was subsequently amended by permission of the court to state a cause of action for rescission on the ground of fraud, plaintiff is now barred from recovery by reason of an election of remedies. On the merits, I think this defense must be decided adversely to them. There is no inconsistency in the two complaints. At all times the plaintiff asserted his ownership of the securities and sought their return or damages therefor. Defendants should not be permitted to say that plaintiff could not recover in the action of conversion because he had not rescinded the contract, but that he is barred from a rescission because he fruitlessly attempted to recover in conversion. The cases of *Shaw* v. *Broadbent* (129 N. Y. 114); *Smith* v. *Savin* (141 id. 315), and *Schenck* v. *State Line Telephone Company* (238 id. 308) furnish ample authority for the present action. Furthermore, this identical question was raised on the argument of the appeal from the order permitting the amendment, and apparently decided adversely to the defendant in *Copeland* v. *Hugo* (212 App. Div. 229).

Defendants also assert that the false representations were promissory only, and do not furnish the basis of an action in fraud. It is perfectly plain that Manning had no intention of ever performing the promises which were made by him to the plaintiff. Neither did the defendant if he was cognizant of them. A false representation as to a state of mind may be a false representation of a material fact. (*Deyo* v. *Hudson*, 225 N. Y. 602; *Adams* v. *Clark*, 239 id. 403.) In this case they did constitute an actionable deceit.

Further, it is urged that plaintiff is not entitled to equitable relief because he made himself a party to a fraud, a deception of the board of directors of the Interstate Mortgage Corporation. It is sufficient answer to this that no fraud actually was perpetrated upon the board of directors. No condition existed which would require any deception so far as they were concerned. Furthermore, the plaintiff's purpose in entering on such a course of conduct was actuated by what the plaintiff believed to be a proper one. He was a stockholder of the Interstate Mortgage Corporation and thought it would be for the interest of all concerned if Hugo was enabled to control it. The authority cited by defendants (*Barnes* v. *Starr*, 64 Conn. 136) in support of their contention is readily distinguishable from the facts of the present action. In the Connecticut case the plaintiff actually participated in the fraudulent deception. She knew that the instrument which she signed and subsequently asked to have canceled, was intended to be used, and that it was used, to deceive others. Copeland's contracts and notes were never actually used by Hugo or Manning to deceive any one.

Lastly, defendants urge that even though fraud and deceit are found, they are not actionable in this case because no damage has been shown. It is their contention that Copeland still retains a certificate for 5,000 shares of stock in the Interstate Mortgage Corporation, and that it has not been shown that this stock was not worth the ten dollars per share. The answer to this position lies in the fact that the stock was tendered to the defendant with a demand for the return of the securities or their equivalent. Furthermore, the theory of the plaintiff's action is that he never actually bought stock, but entered into contracts of purchase which were to have no binding force, and pledged his securities only as apparent collateral without any intention whatever of conferring upon the

defendant the right to sell them. Again, an examination of the balance sheet of the Interstate Mortgage Corporation as of June 30, 1922, shows quite conclusively, when it is considered that no part of the proceeds of the Copeland sale have found their way, or were intended to find their way, into the treasury of the Interstate Mortgage Corporation, that the value of this stock in June and July, 1922, was much less than ten dollars per share. Therefore, from whatever point of view this defense is considered, it is without merit.

For the foregoing reasons the plaintiff is entitled to judgment for the relief demanded in the complaint.