[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] ORDER GRANTING MOTION TO OPEN JUDGMENT, RECONSIDER, VACATE, AND REISSUE MEMORANDUM AND FOR ENTRY OF JUDGMENT
Plaintiffs, Finley Associates, Inc. and George C. Finley (collectively "Plaintiffs") and the Defendant, Crossroads Investment Company, L.P. ("Defendant"), moved this Court (1) to open and vacate the Judgment this Court catered on October 22, 2001, which is dated as of July 10, 2001, (2) to reconsider the Memorandum of Decision dated July 10, 2001 entered in this case (the "Original Memorandum"), (3) to vacate and reissue the Memorandum of Decision with the section of the Original Memorandum containing the Court's findings under the Connecticut Unfair Trade Practices Act, at pages 32 through 35 deleted, and (4) to enter the Judgment attached to the Motion as Exhibit A. Finally, the parties moved that the Court waive the filing fee for opening the Judgment.
The Court, determines that the Motion should be granted. Accordingly, it is hereby ORDERED as follows:
1. The Judgment this Court entered on October 22, 2001, which is dated as of July 10, 2001, is hereby opened and vacated;
2. The filing fee for the motion to open the judgment is waived;
3. The Motion to Reconsider the Memorandum is hereby granted;
4. The Motion to vacate and reissue the Memorandum is hereby granted and the Memorandum is vacated and will be reissued with pages 32 to 35 relating to the Court's findings concerning the Connecticut Unfair Trade Practices Act vacated and deleted;
5. Judgment, dated December 17, 2001, shall enter in the form attached to the Motion as Exhibit A.
Aurigemma, J.
X03 CV 99 0499388 S : SUPERIOR COURT FINLEY ASSOCIATES, INC. : COMPLEX LITIGATION DOCKET 22 Waterville Road : Avon CT 06001 : AT NEW BRITAIN :
GEORGE FINLEY : 119 Southmill Drive : Glastonbury, CT 06073 : :
vs. : :
CROSSROADS INVESTMENT : COMPANY, L.P. : December 17, 2001 1717 Main Street, Suite 2500 : Dallas TX 75201-7341 :
 Present: Honorable Julia L. Aurigemma, Judge JUDGMENT
This case sounding in breach of contract and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). came to this Court by the filing of a complaint dated October 18, 1999, which was amended on January 31, 2000, and thence to a later time when the Defendant answered the complaint and asserted five special defenses and four counterclaims. and thence to a later time. on January 10-12, 2001, when the case was tried to the Court (the Honorable Julia L. Aurigemma, J.). Judgment is rendered as follows: in favor of the Plaintiffs on first count of the Plaintiffs' amended complaint sounding in contract in the amount of $2,000,000; in favor of the Defendant on the second count of the Plaintiffs' amended complaint sounding under CUTPA, which is hereby dismissed with prejudice; in favor of the Plaintiffs on all of Defendant's special defenses which are hereby denied; and in favor of the Plaintiffs on all four of the Defendant's counterclaims, which are hereby dismissed with prejudice.
WHEREFORE, judgment may enter in favor of the Plaintiffs on Plaintiffs' claims for compensatory damages on the first count of the complaint of $1,698,778.10, which with interest and offer of judgment interest is in the total amount of $2,000,000 as of the date hereof.
 Honorable Julia L. Aurigemma, J. Dated: 12-17-01 CT Page 15943
NO. X03 CV 99 0499388 S : SUPERIOR COURT FINLEY ASSOCIATES, INC. and : GEORGE C. FINLEY : COMPLEX LITIGATION DOCKET :
v. : AT NEW BRITAIN :
CROSSROADS INVESTMENT : COMPANY, L.P. : DECEMBER 17, 2001
 REVISED MEMORANDUM OF DECISION 
This Revised Memorandum of Decision is entered pursuant to the Stipulated Agreement of the Parties as approved by the court on December 17, 2001.
In this action the plaintiffs, George C. Finley and Finley Associates, Inc. (the "Finleys" or "Plaintiffs"), seek to recover amounts due wider a Settlement Agreement dated May 24, 1999 from the defendant Crossroads Investment Company L.P. ("Crossroads"). They also seek to recover attorneys fees and punitive damages on the grounds that Crossroads' asserted frivolous defenses and counterclaims and, thus violated the Connecticut Unfair Trade Practices Act, Connecticut General Statutes § 42-110a et seq. (CUTPA).
Facts
After trial the court finds the following facts. Finley Associates was formed by George C. Finley and Peter Kelly in 1983. In 1987, the Finleys were engaged in the business of marketing various pension fund investments, including real estate investment funds Peter M. Seigel ("Seigel") and Harold E. Bigler, Jr. ("Bigler"), through Crossroads Management Partners ("CMP") and its investment advisory company Bigler Investment Management Company ("BIMC"), were in the business of managing equity pension fund investments for corporate and public pension funds primarily through the creation of limited partnerships. Instead of maintaining an internal marketing department, Siegel and Bigler retained outside marketing agents, including the Finleys, to market their investment products to public employee pension funds in the United States.
In 1987 Seigel and Bigler entered into an agreement with the Finleys, which provided that for their marketing services, the Finleys, like CMP's other marketing agents, would receive 20 percent of the income CMP derived from the business developed with the Finleys' assistance. CT Page 15944
In 1987, as a result of Finleys' marketing efforts, CMP negotiated with the Connecticut Treasurer's office forte State to enter into agreement whereby Connecticut invested $100,000,000 with CMP in the Crossroads Constitution Limited Partnership ("Constitution LP"). The Limited Partnership Agreement between CMP and the State in the Crossroads Constitution Limited Partnership established a long terra relationship because the funds were to be invested in illiquid equity investments. Under the terms of the Limited Partnership Agreement the State had limited rights to withdraw its investment from Constitution LP.
From 1987 to 1992, Finley continued to actively market for CMP, and CMP was successful in negotiating two further investments by the State of Connecticut in Crossroads LP, each in the amount of $100,000,000. The Finleys made disclosures to the State as to their role in the foregoing investments. During this period the Finleys also marketed CMP's services to Massachusetts and the City of San Francisco which resulted in CMP's entering into investment agreements with that state and city. From 1987 to 1992, George Finley attended annual meetings with Seigel, during which Seigel would review the performance of Constitution LP with representatives of the office of the Connecticut Treasurer. After 1992, Finley did not attend these meetings with Seigel, but Finley did continue his practice of visiting with the office of the Treasurer on an annual basis to gather general information on the venture capital market and, as appropriate, report back to Seigel.
In 1994, as State lobbying laws were changing, George Finley obtained a letter from attorney Paul L. McCormick, dated December 27, 1994, reviewing the new laws in light of the Finley's business activities. Thereafter George Finley comported his business in accordance with the advice given by Attorney McCormick. He continued to meet with the Treasurers and their representatives for informational purposes about the private equity markets on an annual basis through 1998 and would report any pertinent information he gathered to Seigel. From 1987 to the summer of 1998, CMP paid the Finleys their 20% commission on the amounts made by CMP on Constitution LP, and the investments with Massachusetts and San Francisco, in accordance with the 1987 Agreement.
Commencing in 1995, Crossroads, a private equity investment firm based in Dallas, Texas. began to negotiate with. BIMC to take over certain of its assets and become the investment adviser to CMP. During this process Crossroads became familiar with CMP's relationship with the Finley's and CMP's other marketing agents and the terms under which they worked and were compensated. As of the summer of 1996, Crossroads completed its acquisition of assets from BIMC and Crossroads and its affiliate, Crossroads Investment Advisors, took over the position of investment adviser to CMP. CT Page 15945
During the period from the summer of 1996 to the summer of 1998, Crossroads did not ask the Finleys to perform any services on behalf of CMP. This is significant because of Crossroads' position in this litigation concerning services to be provided by the Finleys under the Settlement Agreement Crossroads continued to pay the Finleys on behalf of CMP under The 1987 agreement between the Finleys and Seigel and Bigler. During this period then Deputy Treasurer Silvester approached Crossroads for a job, but the effort was rebuffed by Crossroads' personnel in Connecticut. In addition, Crossroads had direct contacts with the office of the Treasurer of Connecticut and even sought to negotiate an additional investment of $100,000,000 into a proposed partnership known as Crossroads Constitution II Limited Partnership. According to Bradley K. Heppner, chairman and CEO of Crossroads ("Heppner"), the State did not proceed with this new investment, even though it had been on the verge of closing, after Crossroads rejected Treasurer Silvester's request to pay a finder's fee to an unspecified individual.
From the fall of 1996 through the late fall of 1997, Crossroads made overtures to Seigel and Bigler to acquire the position of CMP in various limited partnership investments including Constitution LP. In the spring of 1998, Crossroads commenced negotiations for such acquisitions. During the course of these discussions Seigel repeatedly told both Heppner and Crossroads representative Matthew Schaefer that he would not cater any such arrangement with Crossroads unless Crossroads agreed to continue to pay the Finleys under the 1987 Agreement. Seigel rejected early drafts of the Assignment Agreement between CMP and Crossroads because they did not provide for Crossroads to assume CMP's obligation to the Finleys under the 1987 Agreement.
Notwithstanding Seigel's position that an assignment to Crossroads had to include the assumption of CMP's obligations to the Finleys, Crossroads continued to try to negotiate its way out of assuming such an obligation. Contrary to the position Crossroads takes here, Crossroads was not troubled by the nature of the payment to the Finleys. It did not balk at paying the Finleys' fees because those fees were illegal finders or lobbying ties, rather, it just wanted to keep the Finleys' 20% for itself. Contrary to the position it has advanced in this lawsuit, when it was attempting to acquire CMP's fights to manage State pension funds, Crossroads had absolutely no interest in having George Finley or Finley Associates perform any services whatsoever.
Crossroads' counsel, John P. Buser, admitted at trial that Crossroads' goal in the negotiations was to acquire the income stream generated by CMP's partnership interests without having to assume the cost of paying the Finleys under the 1987 Agreement. However. CMP's persisted in its CT Page 15946 refusal to assign its assets, i.e. the income stream received for managing the State's fund, unless Crossroads also agreed to assume CMP's obligation to pay the Finleys. Therefore, after lengthy negotiations the final assignment agreement was redrafted to provide in pertinent part at Paragraph 7:
 [Crossroads] hereby assumes, accepts and agrees to timely perform, pay, honor and discharge when due the obligations of CMP under . . . (iv) the Letter Agreement dated May 13, 1987, between George C. Finley and CMP. . . .
Seigel understood that by this agreement Crossroads was assuming the obligation of CMP to pay the Finleys their 20% share of the income stream from the Constitution LP.
A month after executing the Assignment Agreement with CMP on August 31, 1998 in which it agreed to "assume," "timely perform, pay, honor and discharge when due" CMP's 1987 Agreement with the Finleys, Crossroads stopped paying the Finleys. By complaint dated October 30, 1998, Crossroads commenced a declaratory judgment action against the Finleys. In that action Crossroads asserted, the absurd claim that CMP's obligation to pay the Finleys 20% of the management fee it received from the State of Connecticut continued only as long as CMP received that fee) and CMP was no longer receiving that fee [having assigned it to Crossroads], so CMP no longer had any obligation to the Finleys, and, consequently, Crossroads owed the Finleys nothing because Crossroads did not have a contract with the Finleys.
On November 19, 1998, the Finleys filed their Answer, Defenses and Counterclaims asserting claims against Crossroads for breach of contract, conversion, civil theft, unfair trade practices, unjust withholding of wages. money had and received, unjust enrichment, and quantum meruit. The Finleys sought compensatory damages, punitive damages, and attorneys fees. On the date the Finleys moved for a prejudgment remedy against Crossroads in the amount of $3,000,000.
In January 1999, the parties pursued a transfer of the pending action to the complex docket exchanged paper discovery, and took depositions including depositions of George Finley, Heppner, Buser and Seigel. Seigel acknowledged that his deposition testimony was consistent with his testimony in this action, to the effect that Crossroads was obligated to pay the Finleys. The Finleys filed an offer of judgment on their counterclaims in the amount of $3,010,358.08 representing a discount of the more than $3,300,000 they were claiming was owed to them by Crossroads under the remaining term of the 1987 Agreement. While CT Page 15947 Crossroads did not accept that offer, the parties did agree to mediate the matter in February, 1999.
The parties met before a private mediator, David Geronomus, but were unable to reach an agreement at the mediation session. The primary dispute was the amount Crossroads would pay to the Finleys. After a series of calls between the mediator, the Finleys' attorney, Jeffrey L. Williams. and Crossroads' attorney, Robert Izard, the parties agreed upon a settlement figure of $2,330.000. to resolve the dispute. At the time the parties agreed on the settlement amount there was no agreement as to what, if any, services would be provided by the Finleys to Crossroads in the future.
On March 26, 1999, Crossroads' attorney Matthew Baldini sent the fist draft of the settlement agreement to Williams. This first draft incorporated the agreed upon settlement figure of $2,330,000 and provided that this amount would be paid in a lump sum of $488,250 and thereafter in 20 quarterly payments of $92,087.50 beginning in the third quarter of 1999 and continuing through the second quarter of 2004. The draft agreement stated that the Finleys would provide services to Crossroads, but did not specify what services would be provided; Rather, the drawn agreement stated that the services to be provided would begin to be negotiated within 30 days after the settlement agreement was entered.
On April 8, 1999, George Finley traveled to Dallas because Crossroads had indicated it would enhance the relationship if he met senior personnel at Crossroads. Finley did not go to Dallas to negotiate with Crossroads. While Finley was in Dallas, he met with Massey and Heppner. but there was no discussion of the draft settlement agreement. Massey conceded tint he did not seek to incorporate any of the discussion he had with Finley into the terms of the draft settlement agreement and that he left the negotiation of the agreement entirely to others. Heppner claimed that all he sought to do was to ensure that the quarterly payments would be for the services specified in the agreement Massey and Heppner did discuss certain services they wanted Finley to perform, but Massey acknowledged on the stand that Finley said he could not guarantee he could arrange a meeting for Crossroads with the Connecticut Treasurer's office. Heppner did discuss a so-called "talking points memorandum" with Finley. That memorandum outlined five areas in which "Crossroads would value the involvement of Finley and Associates." However, although the attorneys for both parties continued to negotiate the terms of the Settlement Agreement after Finley's return from Dallas, Crossroads never sought to incorporate the content of that memorandum into any version of the settlement agreement.
At the April 8th meeting in Dallas Finley, Heppner and Massey CT Page 15948 discussed the issue of over allocation in equity investments by former Treasurer Silvester. They also discussed Crossroads' problems in meeting with the new Treasurer, Denise Nappier. Crossroads failed to advise George Finley about its previous contacts with former Treasurer Silvester and failed to advise Finley that Massey had learned through industry sources that Silvester had engaged in potential criminal activity involving kickbacks. Heppner and Massey did not tell Finley the details about their negotiations with Connecticut for a new $100,000,000 investment or that Treasurer Silvester had approached Crossroads to pay a finder's fee to an undisclosed party as put of those negotiations.
In January 1999 Crossroads, through its attorney, Izard, received a copy of a memorandum from Finley which listed certain meetings Finley had with the Treasurer's office in 1996. 1997 and 1998, including an entry that reads "June 12, 1997 (Minnesota trip to IAI [another equity fund])." and "September 1998 Fishing trip on my boat." Crossroads never asked Finley about his past contacts with the Treasurer's office under Silvester or any other Treasurer or inquired about his work for other equity funds.
After the meeting in Dallas, George Finley determined that he wanted to limit any services that the Finleys would provide to Crossroads under the settlement agreement to scheduling an annual meeting between Crossroads and the Treasurer's office and supplying Crossroads information upon its request Finley was not willing to raise new monies for Crossroads and was not willing to provide any services in connection with the investments by Massachusetts or San Francisco. Finley wanted to insure that he would be paid by Crossroads under the Settlement Agreement even if he was unsuccessful in scheduling a meeting on their behalf.
The Settlement Agreement was executed on May 24, 1999 and provided in pertinent part as follows:
 WHEREAS, CIC [Crossroads] and Finley have filed claims against each other in a lawsuit entitled Crossroads Investment Company, L.P. v. Finley Associates, Inc. and George C. Finley pending in the Superior Court for the Judicial District of New Britain, Case No. CV-98-0491226-S (the "lawsuit");
 WHEREAS, CIC and Finley desire to settle the lawsuit and the disputes that have arisen between tern;
 NOW, THEREFORE, for the mutual promises contained herein and other good and valuable consideration, CIC and Finley agree as follows: CT Page 15949
 1. At the time of execution of this agreement, CIC shall pay Finley the sum of Four Hundred Eighty-Eight Thousand, Two Hundred and Fifty Dollars ($488,250.00).
 2. CIC shall pay Finley, subject to paragraph three (3), the additional sum of One Million Eight Hundred Forty-One Thousand Seven Hundred and Fifty Dollars ($1,841,750.00) in twenty equal quarterly payments of Ninety-Two Thousand Eighty Seven Dollars and Fifty Cents ($92,087.50) beginning in the third quarter of 1999 Payments shall be made quarterly thereafter through the second quarter of 2004
 3. Payments due under paragraph 2 of this Agreement are calculated based on fees anticipated to be received by CIC during each quarter (the "Anticipated Fees") in its capacity as the general patter of Crossroads Constitution Limited partnership . . .
.........
 6. In consideration of the compensation paid hereunder, Finley and CIC agree that George C. Finley shall provide services to CIC. Services to be provided by George C. Finley will be limited to the Crossroad Constitution Limited Partnership. Finley will use his best effort to schedule meetings with the Treasurer of the State of Connecticut, or the Treasurer's designated stag to provide information on the performance of the fund and to discuss the venture capital environment in general. The meetings will be scheduled on an annual basis. It is expressly agreed that CIC is obligated to make the payments under this agreement whether or not the Treasurer agrees to schedule or attend such meetings. Finley is not required to provide services with respect to Crossroads SF Limited Partnership or Crossroads Capital III Limited Partnership. Finley is not required to raise new capital or additional funds for CIC under this agreement CIC's obligations to make the payments under this agreement do not depend on the extension or renewal of any of the Partnerships. George C. Finley will also provide CT Page 15950 information to CIC regarding the Treasurer's office and the venture capital environment, generally, to CIC, as requested from time to time. George C. Finley (sic) sign a confidentiality agreement, in a form reasonable acceptable to George C. Finley and CIC with respect to information received from or relating to CIC.
On May 19, 1999 Attorney Izard requested that the language set forth in italics in paragraph 6 above be added to the draft settlement agreement. Izard told Attorney Williams that the request came at the insistence of Crossroads' accountants and was "for tax purposes." The Settlement Agreement does not require Finley Associates or Peter Kelly to provide any services whatsoever
On May 26, 1999, Izard forwarded the fully executed Settlement Agreement dated May 24, 1999 with a check from Crossroads Investment Advisers LP to the Finleys in the amount of $488,250. In July 1999, Crossroads Investment Advisers LP sent a check to the Finleys in the amount of 92,087.50, representing the first quarterly payment due under the Settlement Agreement. Significantly, while the Settlement Agreement provides that services were to be provided only by George Finley, the quarterly check from Crossroads is made payable to "Finley Associates, Inc. George C. Finley."
Crossroads never raised any issue of lobbying or the legality of either the 1987 Agreement or the Settlement Agreement as part of the negotiations through May 26, 1999. The Settlement Agreement does not require the Finleys to provide any services to the office of the Treasurer of Connecticut and it does not provide that the Finleys would try to influence the Treasurer, any State official or anyone else.
As of early October, 1999, Crossroads had not asked George Finley to provide any services under the Settlement Agreement and they had not asked him to schedule a meeting with the Treasurer's office or to provide any information. Crossroads never asked George Finley to sign a confidentiality agreement. Finley testified that it would be inappropriate, without a request from Crossroads, for him to schedule a meeting with the Treasurer, because it was up to Crossroads to pick the time to meet the Treasurer.
In late September 1999, Crossroads received various press accounts of the scandal in the Treasurer's office concerning kickbacks paid or sought to be paid to former Treasurer Silvester and certain parties related to hum Crossroads on September 29, 1999, wrote to Finley advising him it would not pay the second quarterly payment due under the Settlement CT Page 15951 Agreement. On September 30, 1999, Crossroads commenced an action in the state courts of Texas against the Finleys; that action was subsequently amended, by Crossroads, to include Peter Kelly, and was removed to federal court by the defendants[1]. Crossroads stopped paying Finley at that time.
On or after October 1, 1999, Crossroads received a letter from Denise Nappier, Treasurer Connecticut requesting information on:
 any and all finder's fees, placement fees, consulting contracts or other compensation currently made in connection with any transaction or ongoing arrangements related to procuring or doing business with the Office of the State Treasurer, as well as any such arrangements during the past five (5) years
While that letter does disclose a federal investigation focused in part on the "improper use" finder's fees, the Treasurer also notes ". . . it is my understanding that use of such fees can, in certain circumstances, be a legitimate business practice,. . . ."
On October 13, 1999, Crossroads responded to this request for information. In its response Crossroads readily, and without any basis whatsoever, characterized the payments it was making to the Finleys under the Settlement Agreement as "finder's fees" rather than installment payments of an agreed-upon settlement amount Crossroads apparently made such characterization as part of its continued effort to avoid honoring its obligations under the Settlement Agreement. Therefore, it is not surprising that the State Ethics Commission undertook to investigate Crossroads.
Discussion of Law and Ruling
 Breach of Contract by Crossroads
The Settlement Agreement is clearly an enforceable contract. The parties freely entered into the Settlement Agreement, with the advice of counsel, after extensive negotiations. The parties intended the Settlement Agreement to resolve their outstanding litigation and clearly expressed the terms of their settlement in the Settlement Agreement. There was mutuality of undertakings and valid consideration. Each party agreed to drop its respective claims in the original litigation before this Court and the parties exchanged general releases. Finley gave up a claim under the 198? Agreement for more than 3.3 million dollars in compensatory damages and dropped his additional claims for attorneys fees and punitive damages, in exchange for Crossroads promise to pay him 2.33 CT Page 15952 million dollars under the terms of the Settlement Agreement.
It is well settled that an agreement to settle a lawsuit constitutes an enforceable contract and is binding upon the parties. Audubon ParkingAssoc. Ltd. Partnership v. Barclay Stubbs, Inc., 225 Conn. 804,626 A.2d 729 (1993). Agreements that end lawsuits are contracts, sometimes enforceable in a separate suit, but also enforceable by entry of a judgment in the original suit. Janus Films, Inc. v. Miller,801 F.2d 578, 583 (2d Cir. 1986). Once reached, a settlement agreement cannot be repudiated by either party. Whether the parties in fact concluded a settlement agreement is determined by the intention of the parties manifested by their words and acts. Hess v. Dumouchel Paper Co.,154 Conn. 343, 347, 225 A.2d 797 (1966). The Connecticut Supreme Court has recognized that settlement agreements, voluntarily and fairly made, should be held valid and enforced by the Courts. Tallmadge Brothers,Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479,746 A.2d 1277 (2000).
While Crossroads contends that the payment to the Finleys was dependent on George C. Finley's provision of services, neither the language of the Settlement Agreement nor the evidence supports such a contention. Under the terms of the Settlement Agreement payment to the Finleys is not contingent upon the provision of any services. Paragraph 2 of the Agreement specifically states that payment is "subject to paragraph three (3)," which pertains to Crossroads' receipt of fees. There is absolutely no language tying the provision of services to payment under the Agreement.
Crossroads relies heavily on the language in Paragraph 6 of the Settlement Agreement which provides "In consideration of the compensationpaid hereunder, Finley and CIC agree that George C. Finley shall provide services to CIC". As stared above, the italicized language was inserted at the request of Crossroads' accountant at the last minute for tax purposes. Paragraph 6 specifically states "It is expressly agreed that CIC is obligated to make the payments under this agreement whether or not the Treasurer agrees to schedule or attend such meetings." Moreover, after Crossroads' lengthy attempts to rid itself of any obligation to the Finleys during the negotiations with CMP, Crossroads' characterization of George Finley's services as a material part of the Settlement Agreement is not credible.
The court finds that Crossroads proposed the breakdown of payments into a lump sum and 20 subsequent quarterly payments before the parties had agreed as to whether and what service George Finley would provide. This schedule stayed the same from the first-draft, proposed by Crossroads, through the final Settlement Agreement. This drafting history flatter CT Page 15953 leads to the conclusion that Crossroads was paying the entire $2.33 million dollars to settle the pending litigation and was not paying separately for any services. In other words, the services were incidental to the overall settlement and the payments were not made for the services.
Crossroads agreed to pay the Finleys 2.33 million dollars, $488,250 at closing and $1,841,750 in 20 quarterly payments of $92,087.50, subject to certain limitations if Crossroads was not paid by the pension fund investors, including primarily Connecticut. Crossroads has not claimed or even alleged that it has not been timely paid any for the management fees due from Connecticut or the other investors in the limited partnerships referenced in the Settlement Agreement. Since ceasing payments to Finley under the Settlement Agreement, Crossroads has collected more than five million dollars and by April 1, 2004, Crossroads will have collected a total of $13,365,000.
By entering into the Settlement Agreement the Finleys dropped their counterclaims and agreed to forego their rights under the 1987 Agreement. George Finley also agreed to perform the following three services only: (1) use his best efforts to schedule an annual meeting between Crossroads and the Connecticut Treasurer's office, (2) provide information to Crossroads about the Connecticut Treasurer's office and the venture capital environment generally, as requested by Crossroads, and (3) sign a confidentiality agreement in form that was reasonably acceptable to Crossroads and George Finley.
The suggestion by Crossroads that the Finleys agreed to provide further services was not supported by any evidence. During the course of negotiating the Settlement Agreement Crossroads never requested the inclusion of any services beyond the three services set forth above. The court finds that Crossroads' assertion that Finley had promised some other performance beyond the three services is not supported by the language of the Settlement Agreement or the evidence.
Significantly, while Crossroads limited the performance of the three services to "George C. Finley," it never sought to modify the payment provisions of the settlement which called for the 2.33 million dollars to be paid to both Finley Associates, Inc., and George C. Finley.
Under the terms of the Settlement Agreement Crossroads owed its second Quarterly payment to the Finleys on October 1, 1999. Crossroads did not make that payment and has failed to make any other quarterly payments required under the Settlement Agreement. Moreover, Crossroads declared to the Finleys in the letter dated September 30, 1999, that the payments under the Settlement Agreement would be "suspended." Crossroads declared CT Page 15954 it would not make further payments to Finley and has never retracted or modified that statement. Crossroads, thus, committed an anticipatory breach of the Settlement Agreement
 An anticipatory breach of contract occurs when the breaching party repudiates his duty before the time of performance has arrived. Its effect is to allow the nonbreaching party to discharge his remaining duties of performance, and to initiate an action without having to await the time for performance.
Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 791, 720 A.2d 242
(1998), quoting, Martin v. Kavanewsky, 157 Conn. 514, 518-519, 255 A.2d 619
(1969). The manifestation of intent not to render the agreed upon performance may be either verbal or nonverbal and is largely a factual determination in each instance. Pullman, Comley Bradley Reeves v.Tuck-It-Away, Bridgeport, Inc., 28 Conn. App. 460, 465, 611 A.2d 435,cert. denied, 223 Conn. 926, 614 A.2d 825 (1992). Crossroads' failure to timely wake the second payment under the Settlement Agreement, its letter advising Finley it would not pay, its initiation of its fraud action in Texas, and its subsequent failure to make further payments, at demonstrate that Crossroads would not perform and that it had committed an anticipatory breach of the Settlement Agreement.
Based on the foregoing, the court finds that Crossroads has breached the Settlement Agreement and awards George C. Finley and Finley Associates the following amounts: $736,700 for 8 quarterly payments past due under the Settlement Agreement plus interest at the rate of 10% per annum pursuant to Connecticut General Statutes § 37-3a of $56,019.85 through July 10, 2001, and $1,731,245, the aggregate amount of the payments remaining under the Settlement Agreement, which amount should be discounted to present value.[2]
 Special Defense of Illegality
Crossroads, in its first special defense, alleges that the Settlement Agreement which it freely entered with advice of counsel, is an illegal contingent fee lobbying contract which is unenforceable under Connecticut General Statutes § 1-97 (b). Crossroads has not met its burden of proving that the Settlement Agreement is illegal and unenforceable.
Section 1-97 (b) provides: "no person shall employed as a lobbyist for compensation which is contingent upon the outcome of any administrative or legislative action." Under Section 1-97 (k) "`Lobbyist' means a person who in lobbying and furtherance of lobbying . . . receives or agrees to receive compensation, reimbursement, or both . . . [of] two thousand CT Page 15955 dollars or more in a calendar year. . . ." Under 1-91 (k):
 "Lobbying" means communicating directly or soliciting others to communicate with any official or his staff in the legislative or executive branch of government . . . for the purpose of influencing any legislative or administrative action except that the term "lobbying" does not include . . . or (4) other communications exempted by regulations adopted by the commission. . . .
Regulations of Connecticut State Agencies, Section 1-92-42a (e) provides:
 The following activities shall not be included when determining whether a person is required to register as a client or communicator administrative lobbyist: . . . (2) ordinary and customary communications made to the agency, or a related entity, including, but not limited to, communications made incident to the performance of a contract or implementation of a permit;. . . .
Under this statutory and regulatory frame work, the Settlement Agreement is not an illegal lobbying contract under Section 1-97 (b). As set forth above, the payments owed by Crossroads under the Settlement Agreement were payments made for the settlement of pending litigation and the few services to be performed by George Finley under that agreement were not performed in exchange for the payments to be made under the agreement. Crossroads had spent a considerable amount of time trying to avoid assuming any obligation to pay the Finleys and certainly did not consider that the Settlement Agreement entailed the employment of George Finley as a lobbyist. Neither the terms of the Settlement Agreement nor the intent of the parties as expressed in their testimony, show that the parties intended the agreement to involve lobbying.
The services which George Finley agreed to perform under the Settlement Agreement do not meet the definition of lobbying us provided under the statutory scheme. The last two services mentioned in Paragraph 6 of the Settlement Agreement were to provide information to Crossroads, as requested from time to time, and to sign a reasonable confidentiality agreement. Clearly, neither of these activities meet the definition of lobbying under Section 1-91 (k) because they do not involve communicating directly or soliciting others to communicate with any State official. The remaining services to be performed by George Finley under the Settlement Agreement was to "use his best efforts to schedule meetings with the Treasurer of the State of Connecticut, or the Treasurer's designated CT Page 15956 staff to provide information on the performance of the fluid and to discuss the venture capital environment in general." Merely agreeing to try to schedule an annual meeting with the Treasurer's office, without any obligation to attend or participate in the meeting-does not constitute lobbying. By agreeing to try to schedule a meeting between Crossroads and the Treasurer, George Finley certainly did not agree to influence administrative action. The statutory scheme does not forbid arty and all contact with the Treasurer's office. The statutes only prohibit lobbying as defined in Section 1-91 (k) (communications for the purpose of influencing administrative action). There is no such communication by the Finleys in this case.
Indeed, the Settlement Agreement provides that the meeting that George Finley agreed to try to schedule on an annual basis was for the purpose of providing information to the Treasurer. The Settlement Agreement provides neither for George Finley's attending annual meetings with the Treasurer nor for his attempt to influence any public official.
In its Post-Trial Memorandum Crossroads repeatedly states that George Finley agreed to influence the Treasurer. See e.g., Crossroads'Post-Trial Memorandum at 4, 27, 34. Crossroads also asserts that George Finley was using the influence of Peter Kelly and had previously served as a "front man" just doing "leg work" for the political influence of Kelly and John Droney ("Droney"), Id. at 3-4. Such statements are completely unsupported by the evidence. Moreover, there was no evidence from any witness that Finley ever "influenced" any Treasurer.
As to the Settlement Agreement, there is no evidence or testimony that anyone even expressed, prior to May 24, 1999 that George Finley would "influence" the Treasurer or any other public official to do anything. "There is no record of any draft of the Settlement Agreement using the word `influence,' `lobbying' or anything remotely like those terms. All George Finley was asked to do, and all he agreed to do, was to use his best efforts to schedule an annual meeting between Crossroads and the Treasurer's office to provide Connecticut with information about the fund and the venture capital market.
Crossroads argues that the Settlement Agreement itself suggests that George Finley agreed to influence the Treasurer because his right to be paid was dependent upon the good relations of the Treasurer. SeeCrossroads' Post-Trial Memorandum at 32-33. This argument ignores the plain language of the Settlement Agreement. George Finley agreed to use best efforts to schedule an annual meeting between Crossroads and the Treasurer's office. But it is just as clear that the Finleys had the right to be paid by Crossroads under the Settlement Agreement, even if the Treasurer refused to schedule a meeting. Thus, Plaintiffs had the CT Page 15957 tight to be paid, even if George Finley was unable to schedule the Treasurer to one of its largest investment fluids. Finley was not required to influence anyone in order to be paid under the terms of the Settlement Agreement.
George Finley also knew he did not need to influence the Treasurer to maintain its contract with Crossroads, because he knew from Peter Seigel that it was very difficult for the Treasurer to withdraw on a discretionary basis, and the rights of withdrawal were limited by the Constitution LP partnership agreement. There was absolutely no evidence that Crossroads needed George Finley's influence to maintain the State's investment in Constitution LP. Events subsequent Crossroads' breach of the Settlement Agreement confirm the foregoing. Crossroads never asked George Finley to schedule a meeting with Treasurer Nappier, despite its claim in this action that it was not paying the Finleys just because Crossroads had been unable to meet with the new Treasurer Thus, it appears Crossroads did hot believe it was urgent or essential to use George Finley's efforts to meet with Treasurer Nappier. Obviously. Crossroads did not think George Finley was essential to keeping the contract. When the scandals about Silvester began to break, Crossroads still never asked for George Finley's assistance in scheduling a meeting or for any information about the Connecticut investment climate. Nevertheless, despite the scandals, Crossroads continues to have the State's investment and continues to collect substantial fees without paying the Finleys. Clearly Crossroads never needed or wanted George Finley's `influence,' and that is why it never asked for that "influence" to be included a service to be provided wider the Settlement Agreement.
The court finds that George Finley never agreed to "influence" any public official for Crossroads, that he was not required under the Settlement Agreement to influence any public official, and that at no time teethe Settlement Agreement has he acted to influence any official for Crossroads.
An additional reason why the Settlement Agreement does not violate Section 1-97 (b), is that the settlement payments to Finley are clearly not "contingent upon the outcome of any" administrative action. The Settlement Agreement specifically provides that Crossroads' obligation to pay the Finleys is not contingent on whether George Finley is successful in scheduling the annual meeting with the State.
On the final day for filing post-trial reply briefs Crossroads filed a Motion to Amend Special Defenses to add a defense under P.A. 00-43. At the time of trial Crossroads' First special Defense to All Counts plead that the Settlement Agreement was illegal under Connecticut General Statutes § 1-97 (b). The present action was commenced in October. CT Page 15958 1999, seven months before P.A. 00-43 became effective on its passage on May 3, 2000. Crossroads answered the Amended Complaint on November 7, 2000, but failed to include any reference to P.A. 00-43 in its Special Defenses.
Amendments should be seasonably made and in exercising its discretion on a request to amend, this court may consider factors such as length of delay, fairness to the opposing parties and negligence, if any, of the party offering the amendment. Connecticut National Bank v. Voog,233 Conn. 352, 364, 659 A.2d 172 (1995); Isaac v. Truck Service, Inc.,52 Conn. App. 545, 727 A.2d 755 (1999). The court finds that the amendment request was not seasonable. Although the plaintiffs addressed the issue of P.A. 00-43 in their Post Trial Brief stating that that public act could not be considered because it had not been specifically plead, Crossroads took no action to amend the Special Defenses until the last date for filing briefs, almost a month after the plaintiffs had raised the issue.
Plaintiffs argue that they had evidence to offer on the issue of "finder's fees" and P.A. 00-43 at the trial. They had disclosed William F. Gallagher, Esq. as an expert witness to offer opinions that the Settlement Agreement did not violate any law regulating finder's fees, because it was not a finder's fee arrangement. Plaintiffs did not offer this testimony because it believed that P.A. 00-43 was not an issue in the trial. For the foregoing reasons, the court denies the Motion to Amend Special Defenses.
Even if the court had allowed Crossroads to amend its special defenses to add an allegation that the Settlement Agreement violated P.A. 00-43, the act has no application to the facts of this case. The Settlement Agreement was negotiated and executed a year before the passage ofP.A. 00-43 and this action was commenced before that passage. Connecticut has a strong policy disfavoring retrospective laws affecting substantive rights of parties because they generally work injustice Gibson v.Fullin, 172 Conn. 407, 412, 374 A.2d 1061 (1977). A law will not be given retrospective effect unless the legislature has manifested that intent "by very plain and explicit words." State v. Jones, 132 Conn. 682, 684,47 A.2d 185 (1946), quoting Bryant v. Hackett, 118 Conn. 233, 238,171 A. 664 (1934). "Laws are to be interpreted as operating prospectively and considered as furnishing a rule for future cases only `unless they contain language unequivocally and certainly embracing past transactions.'" Id., quoting Massa v. Nastri, 125 Conn. 144, 146,3 A.2d 839 (1939). P.A. 00-43 § 19 provides: "This act shall take effect from its passage, except that section 2 shall take effect on January 1, 2001." Nothing in the statute itself suggests it is intended to prohibit "finder's fees" earned before its passage or in connection CT Page 15959 with a state investment transaction which occurred before the statute was passed.
Most importantly, even if this court were to consider P.A. 00-43
applicable to the May 1999 Settlement Agreement between the parties, it would also find that that agreement did not violate P.A. 00-43. The Settlement Agreement was not an "investment transaction." It was intended to settle existing litigation and did not require George Finley to solicit new business from anyone. Thus, he was not being paid to "find" anything.
Based on the foregoing, the court finds that the Settlement Agreement is not illegal under Section 1-97 (b) and that Crossroads has not established its First Special Defense.
Fraud
In its Second Special Defense to All Counts and Count One of its Counterclaim, Crossroads alleges fraud by nondisclosure by the Finleys. Under Connecticut law, the essential elements of an action in fraud are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. Paiva v. Vanech Heights ConstructionCo., 159 Conn. 512, 515, 271 A.2d 69 (1970); Clark v. Haggard,141 Conn. 668, 109 A.2d 358, (1954); Helming v. Kashak, 122 Conn. 641,642-643, 191 A. 525 (1937); Bradley v. Oviatt, 86 Conn. 63, 67, 84 A. 321
(1912); Barnes v. Starr, 64 Conn. 136, 150, 28 A. 980 (1894).
In its Special Defense and Counterclaim Crossroads has alleged that the Finleys were aware or should have been aware of the kickback scandal as of the time at the execution of the Settlement Agreement and failed to disclose this information. See Defenses and Counterclaims p. 4 ¶ 4. p. 9 ¶ ~. Crossroads offered no evidence to support this contention and George Finley testified he had no information about the scandal until he heard about it in the press. Moreover, Crossroads admitted it knewabout this scandal and failed to disclose this fact to the Finleys.
A higher standard of proof must be met to establish a claim of fraud. "Fraud may not be presumed but must be strictly proven by `clear and satisfactory' evidence or `clear, precise and unequivocal evidence.'"Masotti v. Bristol Savings Bank, 43 Conn. Sup. 360, 366, 653 A.2d 836
(1994); Kilduff v. Adams, Inc., 219 Conn. 314, 328, 593 A.2d 478 (1991);Alaimo v. Royer, 188 Conn. 36, 39, 448 A.2d 207 (1982). In Parker v.Shaker Real Estate, Inc., 47 Conn. App. 489, 493 94, 705 A.2d 210, (1998), the Court summarized the law applicable to the defendants' claim CT Page 15960 of fraud by non-disclosure as follows:
 "With respect to [claims of] fraudulent misrepresentation and fraudulent failure to disclose, our Supreme Court has repeatedly stated, that the essential elements of an action in common law fraud. . . . are that: (1) a false representation was made as a statement of fact (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (1995). Additionally. "the party asserting such a cause of action must prove the existence of the first three elements of fraud by a standard higher than the usual preponderance of the evidence which higher standard is `clear and satisfactory' or `clear, precise and unequivocal.'" Id. 540. Moreover, "fraud by nondisclosure, which expands on the first three of the four elements, involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak." Gelinas v. Gelinas, 10 Conn. App. 167, 173, 522 A.2d 295, cert. denied, 204 Conn. 802, 525 A.2d 965 (1987).
Furthermore, courts have consistently held that a prerequisite element of fraud by nondisclosure is a duty to speak. "To constitute fraud by nondisclosure or suppression there must be a failure to disclose known facts and, as well, a request or an occasion or circumstance which imposes a duty to speak." Governor's Grove Condominium Association v.Hill Development Corp., 36 Conn. Sup. 144, 153, 414 A.2d 1177 (1980);Tuccio v. Tuccio, 18 Conn. Sup. 215 (1953); Ceferatti v. Boisvert,137 Conn. 280, 77 A.2d 82 (1950). According to the Restatement, Restitution, § 8, comment b, ". . . Except in a few special types of transactions . . . there is no general duty upon a party to a transaction to disclose facts to the other party . . ." Haddad v. Clark, 132 Conn. 229,235 43 A.2d 221 (1945). The general rule is that silence cannot give rise to an action to set aside a transaction as fraudulent. This is true as to all facts which are open to discovery by reasonable inquiry. Without such a duty, there can be no liability. Mere nondisclosure does not amount to fraud. "It is only in exceptional circumstances that fraud can be based on nondisclosure." Creelman v. Rogowski, 152 Conn. 382, 385, 207 A.2d 272
(1965). Silence is not actionable in a transaction in which parties deal at arm's length, unless circumstances give rise to a duty to speak. SeeFranchey v. Hannes, 152 Conn. 372, 378, 207 A.2d 268 (1965). CT Page 15961
 Regarding the duty to disclose, "the general rule is that . . . silence . . . cannot give rise to an action . . . to set aside the transaction as fraudulent. Certainly this is true as to all facts which are open to discovery upon reasonable inquiry." "[M]ere nondisclosure . . . does not amount to fraud." "To constitute fraud on that ground, there must be a failure to disclose known facts and, in addition thereto a request or an occasion or a circumstance which imposes a duty to speak." Such a duty is imposed on a party insofar as he voluntarily makes disclosure. A party who assumes to speak "must make a full and fair disclosure as to the matters about which he assumes to speak."
See Duksa v. Middletown, 173 Conn. 124, 127, 376 A.2d 1099 (1977) (internal citations omitted). Moreover, "[t]o be actionable for fraud, the nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction."Masotti v. Bristol Savings Bank, 43 Conn. Sup. 360, 365, 653 A.2d 836
(1994), citing, Egan v. Hudson Nut Products, 142 Conn. 344, 347-348,114 A.2d 213 (1955).
Crossroads has never pled or alleged any fact which would create an affirmative duty for the Finleys to make the disclosures. There was no special relationship creating a duty to speak. To the contrary, the parties were adversaries in an acrimonious litigation which had lasted for months in which the Finleys had accused Crossroads of improper conduct including civil theft, conversion and unfair trade practice. The Finleys were seeking compensatory damages of 3.3 million dollars from Crossroads together with punitive damages and attorneys fees. Clearly this was an arms length process and both sides were represented by litigation counsel in all aspects of the negotiations.
Further there was no allegation and no proof that the Finleys made some voluntary disclosure that created a duty to speak. As both Heppner and Massey described the meeting at Dallas there was simply no discussion about either the Finleys' or Crossroads' prior experience with former Treasurer Silvester. That subject did not come up and Crossroads never questioned George Finley about it. Although Crossroads had knowledge about potential improprieties in Silvester's operation of the Treasurer's office, they never disclosed this information to George Finley or sought his thoughts on the possibility of a kickback scandal. At the Dallas meeting Heppner and Massey discussed the issue of possible over CT Page 15962 allocation of State funds with George Finley but their discussion did not address prior relationships with Silvester. With respect to the issue of lobbying. there is no evidence that any one raised any issue concerning the legality or enforceability of the Settlement Agreement during the Dallas meeting or otherwise even raised the subject of lobbying.
There is no evidence that George Finley had any information about the kickback scandal in the Treasurers' office at the time of the Dallas meeting. However, Crossroads did have such knowledge at that time.
Crossroads has claimed that Finley did not disclose the few meetings Finley had with Silvester in his capacity as pension find marketer for Crossroads and/or other clients. However, the court finds that Finley had disclosed these meetings on January 21, 1999 during the course of formal discovery in the then pending litigation.
As to the issue of lobbying, the Settlement Agreement does not involve lobbying and there is no evidence that anyone, including Crossroads or George Finley, had any reason to believe that the Settlement Agreement was subject to the lobbying laws. Thus, George Finley had no "known facts" about lobbying and the Settlement Agreement which required or warranted disclosure to Crossroads. Moreover, it is simply ludicrous that a party represented by a law firm with experience concerning lobbying in Connecticut claims that it relied on an adversary to advise it as to whether the Settlement Agreement involved illegal lobbying.
For the foregoing reasons, the cram finds that Crossroads has failed to prove its fraud defenses and claims against George Finley and Finley Associates.
Breach of Contract by Finleys
In the Third Special Defense and Second Counterclaim Crossroads alleges that it is excused from its obligation to pay the Finleys as a result of a prior material breach of the Settlement Agreement by the Finleys. The court finds that Crossroads has not proved any breach by the Finleys. As of September 29, 1999 when Crossroads stopped paying on the Settlement Agreement. no services had ever been requested by Crossroads and it never raised any issue concerning the Finleys' obligation to perform services under the Settlement Agreement.
As set forth above, the Settlement Agreement only required George Finley to perform the three services: (1) use best his efforts to schedule an annual meeting between Crossroads and the Treasurer's office; (2) provide information to Crossroads on the Treasurer's a office and the venture capital market capital environment generally, as CT Page 15963 requested from time to time by Crossroads; and (3) sign a confidentiality agreement in a form that was reasonably acceptable. Crossroads' anticipatory breach of the Settlement Agreement on September 29, 1999 deprived George Finley of any occasion to provide such services.
Crossroads does not dispute that it never asked George Finley to schedule an annual meeting with the Treasurer's office, during the four months between the signing of the Settlement Agreement and Crossroads' breach on September 29, 1999. Notwithstanding Crossroads' claim that they were anxious to meet with Treasurer Nappier, they never asked George Finley to try to schedule a meeting; they never told him an annual report was ready to present to Connecticut; they never gave him dates when they might come to Connecticut for such a meeting or even asked what progress he might be making to schedule such a meeting.
The court further finds that Crossroads never asked George Finley to provide any information on the Treasurer's office or the venture capital environment after the parties entered the Settlement Agreement. Crossroads never sought any information from George Finley. Therefore George Finley cannot be in breach for not supplying information to Crossroads.
With respect to the final service, it is undisputed that Crossroads never prepared or asked Finley to review or sign a confidentiality agreement. As to all of the three services, George Finley testified he was ready willing and able, to perform had a request been made by Crossroads. There is simply no evidence that George Finley committed any breach, material or otherwise of the Settlement Agreement. For the foregoing reason; the court finds that Crossroads has failed to prove its Third Special Defense and its Second Counterclaim.
Mistake
Crossroads asserts in its Fourth add Fifth Special Defenses and in its Third and Fourth Counterclaims that there was a mistake as to the ability of George Finley to provide services and his willingness to provide these services. Crossroads asserts that this mistake was mutual or in the alternative it was unilateral but that the unilateral was induced by fraud.
"A mutual mistake is one that is common to both parties and effects a result that neither intended." Inlands Wetlands Watercourses Agency v.Landmark Investment Group, Inc., 218 Conn. 703, 108, 590 A.2d 968
(1991). A mutual mistake can exist only when both parties are mutually mistaken about the same material fact, and not where they simply disagree on the meaning of the contract. See Dainty Rubbish Service v. Beacon HillCT Page 15964Association, 32 Conn. App. 530, 537, 630 A.2d 115 (1993) (reversing trial court finding of mutual mistake because there was no evidence that both parties were mutually mistaken about the same fact but simply disagreed on the contracts meaning).
There is no evidence to suggest that George Finley could not or would not have performed the three services required under the Settlement Agreement at the time the parties signed that document. To the contrary, Crossroads elicited testimony from many of the witnesses that they knew of nothing which would have precluded performance at the time of the Settlement. Moreover. George Finley testified that it was his intent to perform, had he ever been asked by Crossroads to perform, before Crossroads breached the Settlement Agreement Crossroads never asked George Finley to perform any services, and, therefore, Heppner's claim that George Finley could not perform is based on pure speculation.
There is no evidence of any "fact" about which both the Finleys and Crossroads were mistaken at the time of the Settlement agreement. Other than the speculation by Heppner, Crossroads never offered any evidence that George Finley could not have performed even after September 1999. No one will never know for sure whether Finley could have so performed, because Crossroads chose to commence litigation in Texas rather than asking George Finley to try to perform. Crossroads has not met its burden to prove that a mistake of fact existed at the time the parties entered into the Settlement Agreement.
To establish a claim for rescission based upon unilateral mistake, Crossroads must show by clear and convincing evidence, that its mistake was caused by the Finleys' fraud. See Greenwich Contracting Co. v. BonwitConstruction Co., 156 Conn. 123, 126-127, 239 A.2d 519 (1968); Gebbie v.Cadle Company, 49 Conn. App. 265, 276-277, 714 A.2d 678 (1998). As discussed above, Crossroads has not come forward with anything like evidence of fraud. The Settlement Agreement was clear as to the services to be provided, and there was no evidence that the Finleys ever mislead Crossroads about those services.
Ethics Commission
After extensive argument both before and during the trial of this matter, this Court ruled that the Complaint of the Ethics Commission against Crossroads. Exhibit For ID Q, and the Stipulated Order between Ethics Commission and Crossroads, Exhibit For ID R, should be excluded. The reasons for this ruling have been stated on the record. Crossroads assisted the Ethics Commission in drafting the complaint against itself. Then, instead of requesting that the Ethics Commission refrain from ruling on that complaint until this court had ruled on the exact same CT Page 15965 issues, Crossroads agreed that the Settlement Agreement constituted an illegal lobbying agreement and/or involved illegal finders fees. The Ethics Commission had the ability to hear evidence from the Finleys, but apparently chose not to do so. Crossroads' attempt to introduce the Ethics Commission ruling against the Finleys. Who were not parties to the Ethics Commission action was an outrageous affront to basic notions of fairness and due process. Notwithstanding this Court's ruling excluding the Ethics Commission Complaint and Stipulated Order, Crossroads has argued extensively from these documents which are not in evidence.
The trial court is invested with a large degree of discretion with regard to the arguments of counsel. See Skrzypiec v. Noonan, 228 Conn. 1,15-16, 633 A.2d 716 (1993). Generally counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. See State v. Kinsey, 173 Conn. 344, 348, 377 A.2d 1095 (1977). In argument, however, counsel may not comment on or suggests inferences from facts not in evidence. See Fonck v. Stratford, 24 Conn. App. 1, 3,584 A.2d 1198 (1991) Accord, Atchinson v. Lewis, 131 Conn. 218, 223,38 A.2d 673 (1944); State v. Huff, 10 Conn. App. 330, 341, 523 A.2d 906
(1987). Here, Crossroads has disregarded the exclusionary ruling of this Court and has repeatedly and extensively referenced the documents which were excluded from evidence.
In an apparent effort to have this Court consider the Stipulated Order between the Ethics Commission and Crossroads, despite the fact it is not in evidence, Crossroads has claimed that the primary jurisdiction doctrine not only requires suspension of this case, but also requires this Court to adopt and follow the Stipulated Order between Crossroads and the Ethics Commission, to which the Finleys were not parties. SeeCrossroads Post-Trial Memorandum at 16. The primary jurisdiction doctrine is not applicable to this action and neither requires this Court to accept the Stipulated Order as binding on any issue, nor requires my suspension or deferral of this action pending further proceedings before the Ethics Commission.
The primary jurisdiction doctrine is conceptually analogous to the doctrine of exhaustion of administrative remedies; both are prudential doctrines created by the courts to allocate between courts and administrative agencies the initial responsibility for resolving issues and disputes in a manner that recognizes the differing responsibilities and comparative advantages of courts and agencies. See Second Injury Fundv. Lupachino, 45 Conn. App. 324, 350, 695 A.2d 1072 (1997).
The Supreme Court has distinguished the two doctrines as follows:
 The doctrine of exhaustion of administrative remedies CT Page 15966 contemplates a situation where some administrative action has begun, but has not yet been completed; where there is no administrative proceeding under way, the exhaustion doctrine has no application. In contrast, primary jurisdiction situations arise in cases where a plaintiff, in the absence of pending administrative proceedings, invokes the original jurisdiction of a court to decide the merits of a controversy.
Sharkey v. Stamford, 196 Conn. 253, 255-256, 492 A.2d 171 (1988) (dismissing injunction action concerning proper administration of employment eligibility list, which was properly in province of city personnel commission).
Crossroads also asserts that Loulis v. Parrott, 241 Conn. 180,695 A.2d 1040 (1997), supports its claim under the primary jurisdiction doctrine. That case was decided under the exhaustion of administrative remedies doctrine not the doctrine of primary jurisdiction. Moreover, theLoulis Court's analysis directly supports the Finleys' contention that this Court need not defer to the Ethics Commission's Stipulated Order with Crossroads.
 Traditionally, the exhaustion of administrative remedies doctrine has been applied where the administrative proceedings were available to be invoked before the institution of the action, and the decision to invoke or forgo the administrative remedy at issue was within the control of the party against whom the doctrine was applied. . . . In the present case, however, the defendants seek the application of the exhaustion doctrine where the administrative proceedings postdate the institution of the action and the decision to invoke or forego the administrative process lay, not in the control of the plaintiffs, against whom the doctrine is sought to be applied, but in the control of the defendants, who seek to benefit from its application.
 We see no sound reason to extend the exhaustion doctrine to this situation. It is one timing to require a party, who has the power to invoke or forgo the administrative process, to invoke it before resorting to the courts. It is quite another to require a. third party to refrain from invoking his or her right to proceed to court simply because [another] CT Page 15967 party has an administrative process available to him or her, over which the third party has no control and with regard to which that third party may or may not be an actual party.
241 Conn. 197-198 (emphasis supplied).
The Loulis Court's analysis is on all fours with this case. At the time this action was commenced in October 1999, there was no pending administrative action. The Ethics Commission did not even begin to investigate Crossroads until November 2, 1999, weeks after Crossroads had commenced its action in Texas and the Finleys had commenced this action. The Finleys had no knowledge of the commencement of that investigation because it was confidential under state law and Crossroads wanted to preserve that confidentiality. The Finleys had no control over and were not parties to that administrative action between Crossroads and the Ethics Commission. Loulis holds that such a subsequently commenced administrative proceeding involving the defendant will not divest the court of its jurisdiction. 241 Conn. at 198.
For the foregoing reasons the court finds in favor of George Finley and Finley Associates, Inc. on the First Count of the Complaint and on the defendant's Counterclaims and finds for the defendant Crossroads Investment Company, L.P. on the Second Count of the Complaint.
By the court,
Aurigemma, J.